UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 09-50055-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION |
| | ) | |
| CHARLES DEAN ANAYA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

This case is before the court on an indictment charging defendant

Charles Dean Anaya with aggravated sexual abuse of a child under the age of

12 in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D). Mr. Anaya has

filed a motion to suppress his statements to law enforcement. See Docket No.

21. The government resists the motion. See Docket No. 29. This motion has

been referred to this magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing was held on Mr. Anaya's motion on April 14,

2010. Appearing in person at the hearing were Mr. Anaya, his counsel

Assistant Federal Public Defender George Grassby, and Assistant United States

Attorney Carolyn Olson on behalf of the government. Three witnesses testified

at the hearing: (1) Special Agent Charles Blackburn, the Federal Bureau of Investigation ("FBI") case agent assigned to Mr. Anaya's case; (2) Special Agent Todd Dawson, also with the FBI; and (3) Dr. Stephen Manlove, a psychiatrist and defense expert in this case. From that testimony and the documents introduced into evidence at the hearing, the court makes the following findings of fact.

Agent Blackburn is an investigator with the FBI stationed at Rapid City, South Dakota. He has been so employed for the last two years. Prior to that, he was a police officer with the Greenville, South Carolina, Police Department for nine years. He is assigned to investigate violent crimes on the Pine Ridge Indian Reservation in South Dakota. In the course of his duties, Agent Blackburn received a report that Mr. Anaya had sexually abused a female minor under the age of 12. Agent Blackburn had no prior knowledge or acquaintance with Charles Anaya prior to receiving this report.

On approximately December 8, 2008, Agent Blackburn learned that Mr. Anaya was then employed as a carpenter at a women's shelter in Kyle, South Dakota. Agent Blackburn needed to interview a witness at this same shelter in an unrelated case. Therefore, on December 10, 2008, Agent Blackburn and Special Agent Sherry Rice, also with the Rapid City FBI office, traveled together to the shelter at Kyle.

The administrators at the shelter agreed to make an office available for Agents Blackburn and Rice to use on December 10, 2008, for their interviews. Upon arriving at the shelter, Agent Blackburn asked about Mr. Anaya and was told that he had not yet arrived at work for the day. Accordingly, the agents proceeded with their interview of the other witness first. When they were finished with the witness interview, Agent Blackburn went outside shortly before noon and found Mr. Anaya working.

There were other workers in the vicinity, so Agent Blackburn refrained from stating what the subject of his interview with Mr. Anaya was initially. Instead, he approached Mr. Anaya, identified himself as an FBI agent, showed Mr. Anaya his credentials, and told Mr. Anaya that Agent Blackburn would like to talk to him if he would agree to do so. Agent Blackburn told Mr. Anaya that he was not under arrest, that he would not be placed under arrest that day, and that if he agreed to talk to Agent Blackburn, he would be free to return to work afterward. Mr. Anaya agreed to talk to Agent Blackburn. At this time, Mr. Anaya was friendly toward Agent Blackburn. It was windy and chilly outside and Agent Blackburn thought both he and Mr. Anaya were glad of the opportunity to go indoors.

The two walked to the shelter building together and, once inside out of the hearing of other persons, Agent Blackburn explained to Mr. Anaya that he

had been accused of sexual abuse by the daughter of one of his former girlfriends.

Agent Blackburn and Mr. Anaya went to the office at the shelter that had been provided to the agents for their interviews. Once there, Agent Blackburn introduced Mr. Anaya to Agent Rice. Both agents were dressed casually and did not display their weapons at any time. Agent Blackburn at this time repeated to Mr. Anaya that his participation in the interview was entirely voluntary, that he was not under arrest, that he could leave at any time, and that would not be placed under arrest that day. Mr. Anaya said he understood and that he agreed to participate in the interview.

The shelter office that the interview took place in was approximately 10 feet by 10 feet. It had a small desk, some chairs, was well-lit, and had an exterior window and a door. The door was closed as shelter residents and employees were present in the area outside the office, but the door was unlocked during the interview.

Once seated in the office, Agent Blackburn noticed that Mr. Anaya's hands were shaking. He inquired about this, and Mr. Anaya explained that he had drunk too much caffeine that morning and that was why his hands were shaking. Agent Blackburn was the lead agent on this investigation and, accordingly, he asked most of the questions. However, Agent Rice did interject a few questions as well. During the interview, the tone of all parties was

conversational.  Neither agent ever raised their voices, never threatened, and never made any promises.  The interview ended after 54 minutes and the agents returned to Rapid City while Mr. Anaya returned to work.  Mr. Anaya made no incriminating statements during this interview, but denied categorically the victim's allegations.  Agent Blackburn testified that he was not wholly convinced by Mr. Anaya's denials.

No mention was made of a polygraph examination at the December 10, 2008, interview.  In addition, Agent Blackburn had no acquaintance with Mr. Anaya prior to that date and, aside from his shaking hands, knew nothing about his physical or mental conditions.  No Miranda[1] warnings were given to Mr. Anaya at any time during the December 10, 2008, interview.

On February 2, 2009, Agent Blackburn contacted Mr. Anaya unannounced at a residence outside of Kyle.  There were other persons present in the home, so Agent Blackburn suggested that he and Mr. Anaya speak in Agent Blackburn's vehicle.  Both men sat in the front seat of that vehicle.  Agent Blackburn explained that the purpose of his contact was to find out if Mr. Anaya would agree to undergo a polygraph examination.  Agent Blackburn explained that his job was to seek the truth and that one instrument that helped him find out the truth was a polygraph examination.  Mr. Anaya indicated that he would be willing to undergo a polygraph examination.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

When asked on cross-examination, Agent Blackburn categorically denied ever making a representation to Mr. Anaya that polygraph examinations were "99% reliable" or any other statement vouching for the accuracy of the test. Agent Blackburn was dressed casually on this occasion and did not display a weapon.

After Mr. Anaya expressed his willingness to participate in a polygraph examination, Agent Blackburn asked him if he was taking any medications as these might affect a polygraph. Mr. Anaya said that he had taken antidepressant medications in the past, but had not taken such medications for seven years. Mr. Anaya also told Agent Blackburn that he sometimes suffered from anxiety attacks.

After this contact with Mr. Anaya, Agent Blackburn contacted Agent Todd Dawson and asked him to come to Pine Ridge to conduct Mr. Anaya's polygraph examination. Agent Dawson is assigned to the Denver FBI office and has been an agent with the FBI for 19 years. He has both his bachelor's degree and a law degree as well as some credit work towards a master's degree in Russian. For the first 13 years with the FBI, Agent Dawson was a full-time case agent on the Wind River Indian Reservation in Wyoming. Thereafter, he was trained as a polygraph examiner and served two years as a part-time case agent and a part-time polygraph examiner. For the last four years, Agent Dawson has been a full-time polygraph examiner. The two agents arranged for

Agent Dawson to administer a polygraph examination to Mr. Anaya on March 12, 2009, at the Bureau of Indian Affairs ("BIA") Office in Pine Ridge, South Dakota.

Agent Blackburn called Mr. Anaya on the telephone to tell him the date and location of the exam. Agent Blackburn inquired whether Mr. Anaya would need transportation from Kyle to Pine Ridge for the exam, and Mr. Anaya indicated he would. The two arranged to meet in the Kyle Police Department parking lot on the morning of March 12, 2009.

At 8:20 a.m. on March 12, Agent Blackburn arrived at the meeting spot and Mr. Anaya was there waiting for him. Mr. Anaya appeared calm and composed on this occasion and his hands were not shaking. Agent Blackburn explained that he would like to have Mr. Anaya ride in the front seat of his vehicle with Mr. Blackburn as he thought that would be more comfortable. Agent Blackburn explained that the back seat in his vehicle is separated from the front seating by a barrier. Agent Blackburn asked if he could pat Mr.Anaya down for weapons first. Mr. Anaya agreed, and Agent Blackburn patted him down, finding no weapons. The two then seated themselves in the front seats of Agent Blackburn's vehicle. Mr. Anaya was not restrained with handcuffs or in any other way.

In the vehicle, Agent Blackburn explained to Mr. Anaya that he was not now under arrest, that he would not be arrested on this day, that his

agreement to undergo the polygraph exam was entirely voluntary, that he could end the exam at any point, and that if at any time he wanted to leave, he need only tell Agent Blackburn and he would drive him back to Kyle immediately. The two men chatted about Mr. Anaya's work as a carpenter and his previously having lived in Roswell, New Mexico. During this drive and seated in a confined environment at close quarters with Mr. Anaya, Agent Blackburn observed no odor of alcohol and no other indication that gave him pause about Mr. Anaya's ability to understand and comprehend what was happening.

Agent Blackburn and Mr. Anaya arrived at the BIA building in Pine Ridge at approximately 9:15 a.m. Mr. Anaya asked to use the restroom and was accommodated. Afterward, at approximately 9:30 Agent Blackburn took Mr. Anaya to meet Agent Dawson in an office on the second floor of the building. The office was located inside a "squad room" or "bull pen" used by BIA law enforcement officers. The office was approximately 10 feet by 10 or 8 feet, with a desk, one chair behind the desk, and two chairs in front of the desk. The desk was located to the left of the door and the two chairs in front of the desk were next to the door. There was an exterior window the shades on which were closed.

Agent Dawson was dressed in a suit and tie and had no weapon. His polygraph machine was sitting on top of the desk. It consisted of a laptop computer, a small box called a Digital Acquisition System ("DAS"), and several

leads connected to the DAS attached to finger plates, a blood-pressure cuff, a motion detector pad which the interviewee sits on, and chest pads.

Agent Blackburn introduced Mr. Anaya to Agent Dawson. The door to the office was open during this period of time. Agent Dawson testified that Mr. Anaya appeared attuned, alert, and paying attention. Agent Dawson sat in one of the chairs in front of the desk and Mr. Anaya sat in the other chair closest to the door, while Agent Blackburn remained standing, looking over the two men's shoulders.

Agent Dawson went over an advice of rights form with Mr. Anaya which was on his laptop computer. See Exhibit 1. The following is a verbatim recitation of the rights set forth on Exhibit 1:

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

See Exhibit 1.

Agent Dawson first asked Mr. Anaya to read the first line of the form under the heading "YOUR RIGHTS," which Mr. Anaya did with no problem or hesitation. Agent Dawson then read the rest of the form out loud to Mr. Anaya, offering additional explanation after each line in order to make sure Mr. Anaya knew what the form was stating. For example, after being advised that he had a "right to remain silent," Agent Dawson explained that that right meant that Mr. Anaya's participation in the exam was entirely voluntary, that he did not have to speak to either agent at all. Throughout the reading of the form, Agent Dawson asked Mr. Anaya if he had any questions. Mr. Anaya never indicated that he was confused or did not understand. He never asked any questions. Agent Dawson observed no shaking or tremors from Mr. Anaya. Agent Dawson asked Mr. Anaya to initial each of the rights on the form if he understood it. Mr. Anaya initialed every statement of rights on the form.[2] Mr. Anaya then signed the form at the bottom, and the two agents signed at the bottom as witnesses. It took Agent Dawson and Mr. Anaya approximately five minutes to go over all of Exhibit 1.

Agent Dawson then went over a consent to interview with polygraph form with Mr. Anaya in the same way as Exhibit 1. See Exhibit 3. Exhibit 3 advised Mr. Anaya that the purpose of the polygraph was to explore "whether or not you touched [name redacted] vagina in a sexual manner underneath her

---

[2]There was a stylus that allowed Mr. Anaya to initial the form digitally.

clothing." Id.  The form went on to state that "[y]ou have the right to refuse to

take the polygraph test." Id.  This statement is initialed by Mr. Anaya. Id.  The

form advised Mr. Anaya that if he agreed to take the polygraph test, he had the

right to stop the test at any time. Id.  This statement is also initialed by

Mr. Anaya. Id.  The form also advised Mr. Anaya that if he agreed to take the

test, he had the right to refuse to answer any individual question. Id.  Again,

Mr. Anaya initialed the statement. Id.  Exhibit 3 also contained a statement

that Mr. Anaya had read Exhibit 3, that he understood his rights, that he

agreed to be examined by polygraph, and that no threats or promises had been

made to get him to agree to the polygraph. Id.  Mr. Anaya initialed statements

that he understood that the room had no observation devices and that the

examination would not be monitored or recorded. Id.  Mr. Anaya signed the

form at the bottom. Id.  Agent Dawson's signature appears in the blank

marked "Examiner," and Agent Blackburn's signature appears as a "witness."

It took approximately 5 minutes for the agents to review Exhibit 3 with

Mr. Anaya.

     After Mr. Anaya had signed Exhibits 1 and 3, Agent Blackburn left the

office and the door to the office was closed.  The time was approximately

9:40 a.m.  Agent Dawson then engaged in what he called a pre-test interview

with Mr. Anaya.  He first filled out a polygraph examination worksheet. See

Exhibit 4.  In doing so, Agent Dawson asked Mr. Anaya a number of questions

about himself unrelated to the allegations of sexual abuse.  Id.  In response to these questions, Mr. Anaya told Agent Dawson he had graduated from high school at Roswell, New Mexico, in 1990, and was currently 37 years old.  Id. He told Agent Dawson that he had been employed as a carpenter at the women's shelter in Kyle since July, 2008; before that as a construction worker in Fort Pierre, South Dakota, for two months; and before that as a construction worker at a college in Kyle for five months.  Id.

In response to Agent Dawson's questions, Mr. Anaya described his health as good, but stated that he had chronic shoulder pain as a result of a motor vehicle accident in August, 2008.  Id.  Agent Dawson asked Mr. Anaya if he was currently experiencing this pain, and Mr. Anaya said he was not.[3] Mr. Anaya told Agent Dawson that he occasionally experienced anxiety attacks. Id.  Agent Dawson asked Mr. Anaya if he was currently experiencing such an attack or if he had experienced any such attacks recently, to which Mr. Anaya responded he was not currently having an anxiety attack, and had not had any such attacks in the previous few weeks or months.  Mr. Anaya stated that he

_____

[3]This information was testified to orally by Agent Dawson, under oath, but is not noted on Exhibit 4.  Agent Dawson testified that he inquired about the level of pain Mr. Anaya was experiencing that day because acute pain can sometimes interfere with the results of a polygraph examination by preventing the interviewee from concentrating on the questions being asked.

In the next passages in the text of this opinion, if a statement is followed by a citation to Exhibit 4, the information is documented there.  If no such citation is present, the information was testified to orally by Agent Dawson, but was not noted in writing on Exhibit 4.

had not taken any prescription or over the counter drugs in the last 24 hours.
Id.

Mr. Anaya also told Agent Dawson that he had attempted suicide in 2001 by taking an overdose of Tylenol, but that he was not currently under the care of a psychologist or psychiatrist.  Id.  Mr. Anaya told Agent Dawson that he had attempted suicide as a result of the death of his father, his breakup with a long-time girlfriend, and his brother's suicide.  Agent Dawson asked Mr. Anaya about his mental state that day, and Mr. Anaya responded that he was "ok." Mr. Anaya said that he had had seven hours of sleep the night before.  Id.

Mr. Anaya told Agent Dawson that he had approximately 20 tribal arrests for public intoxication, three tribal arrests for resisting arrest, and one tribal arrest for driving while under the influence.  See Exhibit 4.  Mr. Anaya related that he had never been arrested for a felony or for any federal crime. Id.

During this pre-polygraph interview, Agent Dawson testified that he observed no signs that Mr. Anaya was experiencing an anxiety attack at the time.  Mr. Anaya was not shaking, sweating, showing increased perspiration, and was tracking the conversation at all times.  Agent Dawson testified that he never discussed with Mr. Anaya either the accuracy or the admissibility in court of the results of a polygraph exam.

Agent Dawson then told Mr. Anaya that the victim first reported the abuse in October, 2008, that it involved multiple incidents occurring approximately 5 ½ years earlier when the victim was 11 and 12 years old. Agent Dawson shared with Mr. Anaya that the polygraph exam consisted of two "relevant questions" about the victim's accusations, interspersed with other questions that would be unrelated to the allegations. Agent Dawson shared with Mr. Anaya exactly what each of the relevant questions were, word by word, stopping to define what each word in the question meant if it was at all subject to any ambiguity. Agent Dawson also explained that the relevant questions would be repeated several times, in different orders each time.

Agent Dawson then conducted a "practice test" with Mr. Anaya where Mr. Anaya wrote down a number on a piece of paper. Agent Dawson then hooked Mr. Anaya up to the equipment and asked some questions, with some of the questions having to do with the number on the piece of paper.

Agent Dawson then conducted the polygraph exam regarding the victim's allegations in this case. He ran three charts, and each time Mr. Anaya denied the victim's allegations when the two relevant questions were asked. Agent Dawson scored the charts and determined that Mr. Anaya was being deceptive as to the relevant questions.[4] The polygraph exam ended at 10:56 a.m. and the equipment was removed from Mr. Anaya. At no time during the exam did

---

[4] The test results were reviewed by an FBI supervisor, who agreed that the test showed deception as to the relevant questions.

Agent Dawson observe any change in Mr. Anaya's behavior, appearance, or demeanor. Agent Dawson testified that Mr. Anaya was alert and cooperative at all times.

Agent Dawson at this time told Mr. Anaya that he had not passed the test. Agent Dawson began discussing with Mr. Anaya at this time what had happened. Agent Dawson testified that the conversation centered around why the incident might have happened, for example, if Mr. Anaya had been intoxicated at the time. On cross-examination, Agent Dawson denied that he had supplied details of the victim's allegations to Mr. Anaya in this portion of the interview, but rather insisted that the conversation centered around possible justifications or extenuating circumstances that might mitigate Mr. Anaya's behavior in his own mind. Agent Dawson testified that he never raised his voice, never made any threats, and never made any promises. He did advise Mr. Anaya that Agent Dawson was not there to judge him morally, that sometimes people do things when they are drinking that they would not do when they were sober.

During this post-test interview, Agent Dawson testified that at times Mr. Anaya looked down and was quiet, but that at other times he looked Agent Dawson in the eye. He never exhibited any shaking or other outward sign of stress or anxiety. Mr. Anaya then made an incriminating statement.

At approximately 11:45 a.m., Agent Dawson opened the door to the office and invited Agent Blackburn back in.  Agent Blackburn sat in the chair next to Mr. Anaya in front of the desk, with Mr. Anaya being in the chair closest to the door, and Agent Dawson sitting behind the desk.  Agent Dawson summarized for Agent Blackburn the admission Mr. Anaya had made, stating to Mr. Anaya to correct him at any time if he said anything wrong.

After Agent Dawson summarized Mr. Anaya's admission, Agent Blackburn told Mr. Anaya he had three choices.  He could write out his statement in his own words in his own handwriting, he could make an audio recording of his statement in his own words, or he could do nothing. Mr. Anaya indicated that he wanted to make an audio recording so that his words could be heard.  At 11:59 a.m., the agents began tape recording Mr. Anaya's statement.  That recording was introduced at the hearing on this motion as Exhibit 2.  Both agents testified at the hearing that tone and demeanor of the agents and Mr. Anaya as recorded on Exhibit 2 are representative of the tone and demeanor of all three men throughout the interview.  On the tape, when asked how he had been treated, Mr. Anaya is heard to say "Both of you guys been pretty well professional."  <u>See</u> Exhibit 2. The taped interview ended at 12:07 p.m.  Mr. Anaya and Agent Blackburn left a few minutes later.

Mr. Anaya and Agent Blackburn traveled back to Kyle together in the front seat of Agent Blackburn's vehicle. During the trip, Agent Blackburn asked Mr. Anaya if there were any other details related to his admission that he could remember that might help the agents determine the time frame of the incident described by Mr. Anaya. Mr. Anaya related an additional fact that helped determine the time frame of the incident to which he had admitted.

At no time on March 12, 2009, did either Agent Dawson or Agent Blackburn ever make any threats or promises to Mr. Anaya. They did tell Mr. Anaya that the results of the exam and the fact of his cooperation in the investigation would be passed along to the United States Attorney's Office. At no time did Mr. Anaya exhibit any signs of nervousness.

At no time during any contact between Mr. Anaya and any agent was the subject discussed of the potential penalties that Mr. Anaya might face if the victim's allegations were substantiated. At no time during any encounter between Mr. Anaya and any agent did Mr. Anaya indicate a desire to leave, a desire to terminate the conversation, or a desire to have the assistance of a lawyer. Both agents testified that if Mr. Anaya had so indicated at any time, they would have immediately stopped talking to Mr. Anaya.

On cross-examination, Agent Dawson testified that sometimes suspects do pass the polygraph examination and, if they do, he tells them they have passed. He related that he recently conducted a polygraph test on a suspect

from Pine Ridge who passed the test. Agent Dawson reported the results to the United States Attorney's Office and the investigation was closed without any charges being asserted against the subject.

Dr. Stephen Manlove is board-certified in psychiatry, internal medicine, and forensic psychiatry. See Exhibit 102. He has degrees from the University of Minnesota Medical School, the Harvard University Divinity School, and St. Olaf College. Id. He completed a five-year residency in psychiatry and internal medicine at the University of Virginia Medical Center and has been in private practice as a psychiatrist in Rapid City, South Dakota, since 1987. Id.

Mr. Anaya's counsel hired Dr. Manlove to conduct a forensic psychiatric evaluation of Mr. Anaya. See Exhibit 101. In order to conduct that evaluation, Dr. Manlove reviewed a number of sources of information in forming his opinions in this case, including the victim's interview with the BIA; a record of a forensic interview with the victim; a letter from Mr. Anaya addressed "to whom it may concern;" the FBI investigative report in this matter; a witness interview with the BIA; Mr. Anaya's medical records from the Kyle clinic from October 25, 2002, to May 22, 2009; and behavioral health records of Mr. Anaya from August 26, 2002, to August 30, 2002. Id.

In addition to these sources of information, Dr. Manlove interviewed Mr. Anaya on three occasions in early 2010. Id. Although Mr. Anaya did not testify at the evidentiary hearing in this matter, his hearsay statements in his

interviews with Dr. Manlove are recorded in Dr. Manlove's report.  See Exhibit

101.  In addition to the information introduced into evidence through Agents

Blackburn and Dawson, Dr. Manlove's report reveals the following information

gleaned from Mr. Anaya.

Mr. Anaya told Dr. Manlove that he had graduated from high school with

a 3.2 grade point average.  See Exhibit 101, page 3, ¶ 11.   He also reported

that he had served in the National Guard from 1990 to 1992.  Id. at 3, ¶ 13.

Mr. Anaya told Dr. Manlove that he has had periodic problems with depression

since 2002, but that he has not sought treatment due to his work obligations.

Id. at 5, ¶ 17.C.  He told Dr. Manlove that he began to experience anxiety

attacks in December 2005.  Id.  He described his symptoms with these attacks

as feelings of intense fear coupled with palpitations, diaphoresis, paranoia that

people would come after him, and a lonesome feeling.  Id.

Mr. Anaya then described to Dr. Manlove his March 12, 2009, interview

with Agents Blackburn and Dawson.  Id. at 6, ¶ 19.  Mr. Anaya told

Dr. Manlove that, when the FBI asked if he would agree to submit to a

polygraph exam, they told him that "polygraphs are 99 percent accurate" and

that if the polygraph showed that Mr. Anaya was telling the truth, the FBI

would "stop bothering him."  Id.

Mr. Anaya told Dr. Manlove that he had not had any alcohol to drink for

36 to 48 hours before the polygraph.  Id.  He told Dr. Manlove that he had only

slept two to three hours the night before because he was anxious about the polygraph.  Id.  Mr. Anaya reported to Dr. Manlove that Agent Dawson sat about two to three feet away from him during the polygraph when he questioned Anaya, a distance that Mr. Anaya perceived to be "uncomfortably close."  Id.  Mr. Anaya told Dr. Manlove that when Agent Dawson began questioning him specifically about the details of the victim's allegations, "his anxiety increased dramatically and he had one of his fairly typical panic attacks with the somatic symptoms, which are described in [¶] 17C." Mr. Anaya told Dr. Manlove that he felt he "had to get it over" [i.e. the interview] because he was afraid he would faint.  Id.  Mr. Anaya said he finally just told Agent Dawson "what he wanted to hear" in order to escape the interview.  Id. Mr. Anaya said that he elected to make an audio recording of his statement rather than hand writing a statement because he was "too tremulous to write." Id.

From his review of the above information, Dr. Manlove formed the opinion that the confession made by Mr. Anaya on March 12, 2009, was a false confession.  Dr. Manlove explained that a false confession is usually composed of two parts:  the confession itself and the post-confession narrative in which the suspect supplies the details in support of the confession.  In support of his opinion, Dr. Manlove noted that persons who suffer from unusual anxiety such as Mr. Anaya are more susceptible to feeling coerced into making a false

confession. In addition, Dr. Manlove testified that the FBI agents in this case did not act deliberately to coerce Mr. Anaya into making a confession nor did they act deliberately to exploit his anxiety attacks. Importantly, Dr. Manlove testified that one would not necessarily know by outward appearance whether another person was having a panic attack. However, Dr. Manlove stated that the interview was "coercive, at least to his [Mr. Anaya's] understanding."

In support of his opinion that Mr. Anaya found the interview coercive, the single greatest factor to Dr. Manlove was Mr. Anaya's belief that the polygraph test was infallible. In addition, Dr. Manlove pointed out other subtly-coercive elements of the interview, including the fact that the building in which the interview took place was federally-owned, there was a guard outside the door (i.e. Agent Blackburn), the two agents were Caucasian and Mr. Anaya was Native American, the agents sat uncomfortably close, the agents offered rationalizations, the agents promised leniency, and Mr. Anaya was suffering from an anxiety attack.

Mr. Anaya now moves to suppress his statements made on December 10, 2008, and on March 12, 2009. The government resists this motion.

## DISCUSSION

### A. Mr. Anaya Was Not In Custody When He Was Interrogated on December 10, 2008

Mr. Anaya's sole argument in support of suppressing his December 10, 2008, statement to the agents was that he was "in custody" on that occasion,

necessitating the advisement of his <u>Miranda</u> rights.  Since the agents did not

advise Mr. Anaya of his <u>Miranda</u> rights on this date, Mr. Anaya argues that his

statement should be suppressed.

The holding of the <u>Miranda</u> case "is that an individual must be advised of

the right to be free from compulsory self-incrimination, and the right to the

assistance of an attorney, any time a person is taken into custody for

questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990)

(citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  <u>Miranda</u> warnings

protect an individual's Fifth Amendment privilege against self-incrimination by

"ensuring that a suspect knows that he may choose not to talk to law

enforcement, to talk only with counsel present, or to discontinue talking at any

time."  <u>Colorado v. Spring</u>, 479 U.S. 564,  574 (1987).  A <u>Miranda</u> warning is

required prior to questioning whenever two conditions are present:  (1) the

suspect is being interrogated and (2) the suspect is in custody.  <u>Unites States v.

Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at

1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably

likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v.

Innis</u>, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Mr. Anaya

was being interrogated on December 10, 2008, and neither disputes that he

was not advised of his <u>Miranda</u> rights.  Therefore, whether Mr. Anaya's

statements should be suppressed hinges on whether Mr. Anaya was in custody at that time, thereby requiring the administering of <u>Miranda</u> warnings.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. <u>See e.g.</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Anaya's statements were *not* the subject of custodial interrogation on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." <u>Griffin</u>, 922 F.2d at 1347 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984)). Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been

curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-47 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on

each side of the balance and rendering a decision accordingly." <u>Flores-Sandoval</u>, 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. <u>Griffin</u>, 922 F.2d at 1348; <u>Carter</u>, 884 F.2d at 370.

In <u>United States v. Czichray</u>, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the <u>Griffin</u> factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. <u>Id.</u> at 826. Nonetheless, the <u>Griffin</u> factors still appear in Eighth Circuit case law after <u>Czichray</u>, and continue to be cited with approval for determining the custody issue. <u>See</u> <u>e.g.</u> <u>United States v. Plumman</u>, 409 F.3d 919, 923 (8th Cir. 2005).

Whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go. <u>Griffin</u>, 922 F.2d at 1348; <u>Carter</u>, 884 F.2d at 370 (citing <u>United States v. Jimenez</u>, 602 F.2d 139, 145 (7th Cir. 1979)).

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses.  Griffin, 922 F.2d at 1349-50.

The court in United States v. Johnson, 64 F.3d 1120, 1125-26 (8th Cir. 1995), found that the suspect was not in custody even though he was questioned in the back of a patrol vehicle.  Specific factors which lead the court to its conclusion were that the suspects were specifically advised that they were not under arrest, they were not handcuffed or otherwise restrained while in the squad car, they were not isolated, their passengers remained at the scene, no strong arm tactics were employed, the questioning was straightforward, and the officer who questioned the suspects was not in uniform.

Here, the court concludes that Mr. Anaya was not in custody during the December 10, 2008, interview and, thus, that Miranda advisements were unnecessary.  The interview took place at Mr. Anaya's place of work, not the police station.  He was not physically restrained in any way.  The agents were dressed in street clothes and did not display their weapons.  The questioning was low-key and conversational.  Most importantly, while still outside the shelter, Mr. Anaya was told he did not have to talk to the officers, he was not under arrest, and he would not be arrested that day.  As further evidence that

Mr. Anaya did not feel intimidated or pressured by the agents on this day, the court notes that he made no incriminating statements this day. A reasonable person in Mr. Anaya's position would have felt free to decline to talk to the agents and free to leave the interview at any time. Accordingly, the court recommends that Mr. Anaya's motion to suppress his December 10, 2008, statement be denied.

**B.    Whether Mr. Anaya's March 12, 2009, Statement Should Be Suppressed**

Mr. Anaya makes three arguments in support of the suppression of his March 12, 2009, statement. First, he argues that the advisement of <u>Miranda</u> rights given to him was incomplete and incorrect. Second, he argues that his waiver of his <u>Miranda</u> rights was not valid. Third, he argues that his statement itself was coerced. The court addresses these arguments individually.

**1.    Whether the Advisement of Rights Was Complete and Accurate**

Mr. Anaya argues that the advice of rights given to him by Agent Dawson was incorrect and/or incomplete. The advisement of rights given by Agent Dawson was by no means incorrect or incomplete. The <u>Miranda</u> Court required that, prior to custodial interrogation, a suspect must be advised "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda</u>, 384 U.S. at 445. Agent Dawson's advisement left nothing out, nor did it state anything incorrectly.

Mr. Anaya argues that Agent Dawson never told him that he could be subject to prosecution for a federal felony nor what the potential penalty for that felony might be should Mr. Anaya be convicted. The Eighth Circuit has rejected the argument "that Miranda requires a specific warning on the potential sentencing consequences of waiving the right to remain silent." United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995). "[T]here are no magic words that automatically satisfy Miranda's constitutional concerns. Instead, the appropriate inquiry is whether the warning that [defendant] received reasonably conveyed his constitutional rights as required by Miranda." Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005) (citations omitted). Because the Miranda Court "did not prescribe an exact format or postulate the precise language that must be used in advising a suspect of his constitutional right to remain silent..., the substance and not the form of the warnings should be of primary importance." Tucker v. United States, 375 F.2d 363, 369 (8th Cir. 1967).

The advisement of rights given in this case encompassed everything required by Miranda. See Miranda, 384 U.S. at 445. Agent Dawson was not required to specifically advise Mr. Anaya of the potential of federal, as opposed to state or tribal, criminal charges. The court notes, further, that the reason for the rule that interrogators do not have to tell suspects of the charges they are going to be facing and the exact penalties for those charges is easily

understood: until the investigation is complete, it is nearly impossible for police in Agent Dawson's position to determine what federal charges, if any, are supported by the evidence and what penalties could result, especially in view of the fact that the <u>Miranda</u> advisement takes place *before* the defendant makes a statement to police. The court concludes that Agent Dawson accurately and adequately advised Mr. Anaya of his rights.

### 2. Whether Mr. Anaya's March 12, 2009, Statement Was Voluntary

Mr. Anaya argues that his statement was involuntary because he did not feel free to decline to answer the agents' questions, the questioning was spearheaded and dominated by law enforcement, he was the focus of the investigation, he was told not to seek the advice of an attorney, he had no attorney accompanying him, he was unaware of the potential prison sentence he faced, the FBI took no steps to determine whether he was sober enough to answer questions, and that he was not well educated in legal matters nor was he legally sophisticated.

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." <u>Miller v. Fenton</u>, 474 U.S. 104, 109 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession

was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998). The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." <u>Id.</u> The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004).

### a. <u>Colorado v. Connelly</u>

The landmark Supreme Court case on the topic of voluntary confessions is <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986). In <u>Connelly</u>, defendant Francis Barry Connelly approached a police officer and, without any prompting, stated that he wanted to confess to a murder. <u>Id.</u> at 160. The officer immediately advised Connelly of his <u>Miranda</u> rights and asked him if he had been drinking or taking any drugs. <u>Id.</u> Connelly denied taking any mind-altering substances but stated that, in the past, he had been a patient in several mental hospitals. <u>Id.</u> Connelly then spoke to a homicide detective, who again advised him of his <u>Miranda</u> rights, and Connelly confirmed that he understood those rights. <u>Id.</u> Connelly then confessed to the murder of a young girl that he claimed to have committed approximately nine months earlier, telling the officer the location where the murder took place. <u>Id.</u> A check of police records revealed that the

body of an unidentified female had been discovered four months earlier in the location identified by Connelly.  Id.  At no time did the homicide detective who took Connelly's confession observe any indication that Connelly was suffering from any kind of mental illness.  Id. at 161.

The next day, Mr. Connelly became visibly disorientated and was sent to a state hospital for evaluation, where a psychiatrist diagnosed him with chronic schizophrenia manifested through "command hallucinations" that interfered with his ability to make free and rational choices.  Id. at 161.  Mr. Connelly stated that the "voice of God" instructed him either to confess to the murder or to commit suicide.  Id.  The psychiatrist confirmed that, although Mr. Connelly's psychosis did not impair his cognitive abilities, that is, he was able to intellectually understand his Miranda rights, his psychosis did motivate his confession.  Id.

Based on this evaluation, the Colorado trial court found that Mr. Connelly's statements were involuntary and should be suppressed even though police had not coerced Mr. Connelly's confession or otherwise overreached.  Id. at 162.  The Colorado trial court held that Mr. Connelly's mental illness both impaired his free will by compelling him to confess and vitiated his attempted Miranda waiver.  Id.  The Colorado Supreme Court affirmed, finding that Mr. Connelly's severe mental illness overbore his rational judgment and free will, making his confession involuntary and negating his

ability to make a valid waiver of his rights.  Id.  That court held that the absence of police coercion or duress did not foreclose a finding that Connelly's statement was nevertheless involuntary.  Id.

The United State Supreme Court reversed, finding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[5]  Id. at 167.  The Court based its decision, in part, on the fact that cases considered by the Court over the 50 years preceding Connelly involving the constitutional privilege against compulsory self-incrimination had all "focused upon the crucial element of police overreaching."  Id. at 163, 163 n.1 (citing Mincey v. Arizona, 437 U.S. 385, 387, 396-402 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 390 U.S. 519, 519-21 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); Beecher v. Alabama, 389 U.S. 35, 36-38 (1967) (police officers held gun to the head of wounded confessant to extract confessions); Davis v. North Carolina, 384 U.S. 737, 739-53 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); Reck v. Pate, 367 U.S.

---

[5]"Although Connelly arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the Connelly decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well."  United States v. Bad Hand, 926 F.Supp. 892, 899 (D.S.D. 1996).

433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); <u>Culombe v. Connecticut</u>, 367 U.S. 568, 569-70, 621-22 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); <u>Payne v. Arkansas</u>, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food; confession obtained when police officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep)).

The Court explained that the argument that an involuntary confession violates a defendant's Constitutional rights is predicated on the Due Process Clause of the Fifth and Fourteenth Amendments and that, in other contexts, the Court has always required as part of the *prima facie* showing of a due process violation that there was some sort of *state action*. <u>Id.</u> at 165. Thus, in the context of a claim that a statement was involuntarily wrung from a defendant in violation of the Due Process Clause, the Court concluded that it was congruent with due process precedent that there be established the necessary element of state action, in this context, police coercion or overreaching. <u>Id.</u>

In addition, the Court noted that the purpose of excluding involuntary statements taken in violation of the Due Process Clause is to deter police from

violating other persons' Constitutional rights in the future.  Id. at 166.  By

applying the exclusionary rule in Connelly's case, in which there had been no

police wrongdoing, the Supreme Court concluded that the purpose of the

exclusionary rule would not be furthered.  Id.  The Court pointed out that rules

of evidence, not the Constitution, exist to ferret out false or untrustworthy

evidence.  Id. at 167.  The Due Process Clause seeks to prevent "fundamental

unfairness" in the use of a statement, whether that statement is true or false or

otherwise unreliable.  Id. (citing Lisenba v. California, 314 U.S. 219, 236

(1941)).

### b.    Other Cases

The Connelly Court made clear that the Court's previous decisions in

Blackburn v. Alabama, 361 U.S. 199 (1960), and Townsend v. Sain, 372 U.S.

293 (1963) were still good law.  Connelly, 479 U.S. at 164-65.  In Blackburn, a

defendant's statement was held to be involuntary where the police learned that

the defendant had a history of mental problems and was "probably insane" at

the time of his confession.  Blackburn, 361 U.S. at 207-08.  However, the

evidence in that case was that the police *exploited* this weakness with coercive

tactics by holding the defendant incommunicado for 8 to 9 hours of sustained

interrogation in a tiny room which was, on occasion, literally filled with police.

Id.  It was these coercive tactics, not the defendant's mental condition *alone*,

that supported the Court's conclusion that the confession had been wrung

from the defendant against his will.  Id. at 206-07.  Similarly, in the Townsend

case, police administered a truth serum to the defendant and then proceeded to obtain a confession from the defendant.  <u>Townsend</u>, 372 U.S. at 298-99. The <u>Connelly</u> Court pointed out that both <u>Blackburn</u> and <u>Townsend</u> supported the Court's holding that "mere examination of the confessant's state of mind can never conclude the due process inquiry."  <u>Connelly</u>, 479 U.S. at 165.

Approximately six weeks after it issued its decision in <u>Connelly</u>, the Supreme Court issued another decision, <u>Colorado v. Spring</u>, 479 U.S. 564 (1987), further explaining what it meant by police "coercion."  In that case, a defendant had been told that police wanted to interrogate him about some firearms offenses.  <u>Spring</u>, 479 U.S. at 566-67.  The police duly advised Spring of his <u>Miranda</u> rights, which Spring waived.  <u>Id.</u>  Then, during the course of the interrogation, the police questioned Spring about his involvement in a murder. <u>Id.</u> at 567.  Spring later argued that his waiver of his <u>Miranda</u> rights was "compelled" because he was not told at the inception that he would be questioned about the murder.  <u>Id.</u> at 573.  The Court rejected this argument, stating that, "[h]is allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion:  'the duration and conditions of detention . . ., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance or self-control.' "  <u>Id.</u> at 574 (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)).  Thus, the Supreme Court indicated

35

that the physical and mental state of the defendant is relevant to the inquiry as to what constitutes "coercion."  Id.

 In United States v. Rohrbach, 813 F.2d 142, 145 (8th Cir. 1987), decided shortly after the Connelly decision, the Eighth Circuit Court of Appeals applied the holding in Connelly to affirm the district court's determination that the defendant's confession was voluntary.  In Rohrbach, the defendant made an argument nearly identical to that advanced by Connelly, that is, that "his personal characteristics, including minimal formal education and a history of alcohol and drug abuse and of suicide attempts, are indicative of an easily overborne will."  Id. at 144.  Like the police in Connelly, the police in Rohrbach had no indication that the defendant suffered from any mental impairments or infirmities and there was no police overreaching or coercion.  Id.  The court rejected Rohrbach's argument, holding that, in light of Connelly, the fact that Rohrbach had not proved, or even alleged, any coercive activity by the law enforcement agents who interrogated him was fatal to his argument that his statement was involuntary.  Id.

The Eighth Circuit came to the same conclusion in United States v. Makes Room For Them, 49 F.3d 410 (8th Cir. 1995), in which the defendant argued that both his confession and Miranda waiver were involuntary due to his lower-than-average intelligence.  Makes Room For Them, 49 F.3d at 415. The defendant contended that his limited intellectual abilities made him more

susceptible to having his will overborne.  Id.  The court rejected this argument,

finding that, "[a]lthough age, education, and experience are factors in the

voluntariness analysis, they are not dispositive."  Id.  The court further stated:

> We may assume for the sake of argument that Makes Room had a
> somewhat diminished capacity to resist pressure to waive his
> rights and confess.  However, this is one of two factors; we must
> also consider the conduct of the police.  We simply do not find the
> requisite coercive activity here.

Id. (internal citations omitted).

The Rohrbach case contains the singular statement that, "Connelly

makes it clear that such personal characteristics of the defendant are

constitutionally irrelevant absent proof of 'coercion brought to bear on the

defendant by the State.' " Rohrbach, 813 F.2d at 144.  One might read this

passage to mean that the court must first conclude that there was police

coercion, considering that matter in a vacuum without reference to the

defendant's characteristics, before evidence of a defendant's characteristics

become relevant.  However, such an interpretation is not warranted in the

context of the case, nor in light of the teachings of the Supreme Court.

First of all, although Rohrbach states that a defendant's state of mind is

irrelevant until coercion is first found, this is understandable in that the facts

presented were nearly identical to the facts in Connelly:  the police did not

know the defendant had any mental infirmities, there was no outward

indication of the infirmities, and there was no police coercion or overreaching.

Compare Rohrbach, 813 F.2d at 144; with Connelly, 479 U.S. at 161. Under such circumstances, it is really not necessary to consider the defendant's mental conditions. Secondly, although Rohrbach appears to state that a defendant's state of mind is irrelevant, the court nevertheless considered the defendant's state of mind in reaching its conclusion that there had been no police overreaching or coercion. Rohrbach, 813 F.2d at 144-46.

A final reason that the Rohrbach court's statement that a defendant's state of mind is irrelevant should not be taken at face value is that such a statement would be contrary to Supreme Court precedent, which continues to hold that the test for determining whether a defendant's statement was voluntary is the totality of circumstances. See Withrow v. Williams, 507 U.S. 680, 688-89 (1993) (citing Arizona v. Fulminante, 499 U.S. 279 (1991); and Miller v. Fenton, 474 U.S. 104, 109-10 (1985)). Indeed, earlier in the opinion, the Rohrbach court itself stated that the totality-of-the-circumstances was the appropriate test. Rohrbach, 813 F.2d at 144.

Other Eighth Circuit cases subsequent to the Rohrbach and Connelly decisions continue to examine the defendant's characteristics as part of the totality-of-the-circumstances test. Makes Room For Them, 49 F.3d at 415. In Makes Room For Them, the Eighth Circuit stated of the defendant's argument that his low intelligence and education rendered him "peculiarly susceptible to having his will overborne," that, "[c]onsidering these factors in totality, we

38

cannot find that Makes Room's will was overborne, either as regards his confession or his <u>Miranda</u> waiver." <u>Id.</u> The court considered the defendant's characteristics as part of the totality of circumstances, even though it went on to conclude that there was no coercive activity on the part of the police. <u>Id.</u>

The decision in <u>Makes Room For Them</u> is not necessarily inconsistent with the sentence in <u>Rohrbach</u> that the defendant's state of mind was "irrelevant." Rather, the cases can be harmonized by resort to the <u>Connelly</u> decision. When the <u>Connelly</u> Court held that there must be police coercion as a necessary predicate to finding a statement to be involuntary, that did not necessarily mean that a defendant's characteristics are irrelevant. Under the totality of circumstances test, which is still the relevant test, the defendant's characteristics are still relevant to the extent the police knew or should have known of those characteristics and deliberately exploited those characteristics. Hence, in a case like <u>Connelly</u>, where the homicide detective had no reason to know of Connelly's mental illness, the inquiry as to whether there was police coercion necessarily excludes Connelly's personal characteristics. And, in a case like <u>Blackburn</u> or <u>Makes Room For Them</u>, where the personal characteristics of the defendant are known to police or readily apparent, the courts have considered those characteristics in determining whether police engaged in coercion or overreaching. <u>See also</u> <u>United States v. Morse</u>, 569 F.3d 882, 885 (8th Cir. 2009) (stating that voluntariness depends on the totality of

circumstances, including the conduct of law enforcement officials *and* the characteristics of the accused); <u>Jenner v. Smith</u> 982 F.2d 329, 333 (8th Cir. 1993) (holding that a defendant's personal characteristics bearing on her ability to resist interrogation pressures is relevant, but cannot alone render the statement involuntary without police coercion or overreaching being also present).

Indeed, although the <u>Connelly</u> Court was very clear that police coercion was *required* before a statement could be found to be involuntary, there is every indication that the Court contemplated that the defendant's mental status would still be considered in deciding *whether* police coercion existed. For example, the Court stated that, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " <u>Connelly</u>, 479 U.S. at 164 (citation omitted). Thus, the Court indicated that a defendant's mental status, *as it relates to police coercion*, is still relevant. And in the passage discussing the <u>Blackburn</u> and <u>Townsend</u> decisions, the Court stated that examination of the defendant's state of mind could never *conclude* the due process inquiry, thus leading to the obvious inference that a defendant's state of mind was still *part*

*of* that inquiry.  Id. at 165.  This reading of Connelly is affirmed by the Court's

subsequent decision in Spring where the Court enumerated the defendant's

physical and mental condition as relevant to the inquiry regarding whether

coercion had taken place.  Spring, 479 U.S. at 574.

      **c.**     **Application of the Law to Mr. Anaya' Statements**

Based on the legal analysis of Connelly and its progeny, the court

considers all the facts and circumstances surrounding Mr. Anaya' statements

in determining whether those statements were voluntary.  Withrow, 507 U.S. at

688-689; Fulminante, 499 U.S. 279; and Fenton, 474 U.S. at 109-10.  In this

context, the court also considers Mr. Anaya' personal characteristics to the

extent they were known to the agents.  Blackburn, 361 U.S. at 207-08; Makes

Room For Them, 49 F.3d at 415; Jenner, 982 F.2d at 333.  The court

concludes that Mr. Anaya's March 12, 2009, statement was voluntary.

As an initial matter, the court notes that, for purposes of the pending

motion, Dr. Manlove's ultimate conclusion that Mr. Anaya's confession was a

false confession, is beside the point, although it may be relevant at the trial of

this matter where Mr. Anaya's guilt or innocence will be decided.  Instead, as is

evident from the above discussion, the inquiry raised by Mr. Anaya's motion is

whether the police violated his constitutional rights when taking his March 12,

2009, statement.[6]  That is, whether the police coerced Mr. Anaya into

confessing, whether that confession has a basis in fact or not.

The court finds no evidence of the traditional indicia of coercion in the

facts presented by this case.  The length of the interview–approximately three

and one-half hours–was not exceptional and certainly not like the periods of

confinement at issue in cases like Greenwald, 390 U.S. at 519-21 (defendant

interrogated for 18 hours); Davis, 384 U.S. at 739-53 (defendant held for 16

days of interrogation); Reck, 367 U.S. 436-44 (four days interrogation);

Culombe, 367 U.S. 569-70 (five days interrogation); Payne, 356 U.S. 561-68

(three days interrogation); or Ashcraft, 322 U.S. at 153-55 (36 hours non-stop

interrogation).

Furthermore, Mr. Anaya first made his incriminating statement while

only Agent Dawson was in the room with him.  Thus, this is not a situation

where Mr. Anaya's will was overcome by sheer numbers of police crowding into

the room with him.  Blackburn, 361 U.S. at 207-08.

The court also notes that Agents Dawson and Blackburn told Mr. Anaya

that his participation was voluntary, that he could leave at any time, and that

he only had to ask and Agent Blackburn would immediately take him back to

Kyle.  The evidence also shows that Mr. Anaya had sufficient intelligence and

_____

[6]As the Supreme Court noted, the rules of *evidence* exist to ferret out
*false* or untrustworthy evidence.  Connelly, 479 U.S. at 167.  The suppression
motion calls into question constitutional issues, not evidentiary issues.

sufficient experience with the criminal justice system, albeit the tribal system, that he could be expected to comprehend this information when it was relayed to him.

Importantly, Dr. Manlove opined (though his opinion is not binding on this court), that neither Agent Dawson nor Agent Blackburn acted with the intention of coercing Mr. Anaya into making a statement, and that neither agent deliberately exploited Mr. Anaya's anxiety condition. As Connelly stated, in order to find a statement to be involuntary under the Due Process Clause of the Fifth Amendment, there *must* be coercive state action. Connelly, 479 U.S. at 165.

Rather, the gravamen of Dr. Manlove's opinion is that Mr. Anaya's subjective belief in the infallibility of the polygraph exam, coupled with his anxiety disorder, made him more than ordinarily susceptible to feeling pressured into making a false confession. First of all, the court notes that the clear and unequivocal testimony of both Agents Dawson and Blackburn at the hearing in this matter was that they never vouched for the reliability of the polygraph exam or its admissibility in court. The agents' statements were made under oath, in open court, and subject to cross-examination.

The only evidence to the contrary is Mr. Anaya's hearsay statement made to Dr. Manlove and recorded in Dr. Manlove's report that the agents told him the polygraph was "99% reliable." This statement by Mr. Anaya was not made

under oath and was not subject to cross-examination.  Furthermore, it is entirely possible that nuances of what Mr. Anaya stated orally might not have been accurately captured by Dr. Manlove's written summary of what he said.[7]

Finally, Agent Blackburn testified that he had never heard the 99% figure prior to defense counsel proposing it in open court.  For these reasons, and to the extent the agents' testimony conflicts with Mr. Anaya's statements to Dr. Manlove, the court credits the agents' testimony and finds that no such vouching was ever done by the agents.

The second prong of Dr. Manlove's opinion hinges on Mr. Anaya's unique susceptibility to feeling pressured because of his anxiety disorder.  The facts adduced at the hearing indicate that neither Agent Dawson nor Agent Blackburn acted to exploit this condition, a conclusion also reached by Dr. Manlove.  Agent Dawson asked Mr. Anaya about his health, and Mr. Anaya told Agent Dawson that he sometimes suffered from anxiety attacks.  Agent Dawson testified that he followed up on this information by asking Mr. Anaya whether he had suffered an anxiety attack recently, to which Mr. Anaya replied that he had not had an anxiety attack for some period of weeks or months before March 12, 2009.  Furthermore, both agents testified that they never observed any outward indication that Mr. Anaya was suffering an anxiety

---

[7]As, for example, we saw in Agent Dawson's written summary of his conversation with Mr. Anaya in which certain details which elaborated on the main data were not captured.  See Exhibit 4, and the discussion in the Facts section of this opinion.

attack at any time during their interaction with him on March 12, 2009. The only direct evidence the court has of Mr. Anaya's mental state on this date is the tape recording of his statement. The court notes that Mr. Anaya's voice betrays no tremulousness, shaking, or other indication of anxiety. See Exhibit 2.

Mr. Anaya told Dr. Manlove, again not under oath and not subject to cross-examination, that he *had* in fact, suffered an anxiety attack on March 12, 2009, during his interview and that that attack caused him to want to confess so he could end the interview and end the source of his anxiety. However, this statement is not necessarily in conflict with the agents' testimony.

Dr. Manlove pointed out that a person may suffer an anxiety attack and show no outward, objective, or visible signs that he is so suffering. Since the pertinent question here is whether the police acted coercively or overreached, the inquiry is what the police observed and acted upon. Just as in Connelly and Rohrback, if the police are unaware that the defendant is experiencing something inwardly that affects the defendant's free will, the police are not guilty of coercion. Connelly, 479 U.S. at 165-67; Rohrbach, 813 F.2d at 144-45. Here, Agent Dawson took the prophylactic step of making inquiry of Mr. Anaya's condition and Mr. Anaya assured Agent Dawson that he was not under unusual stress. If that circumstance changed later on during the

interview, it cannot be said that Mr. Anaya's failure to inform Agent Dawson of the change amounted to coercion on Agent Dawson's part.

Mr. Anaya also told Dr. Manlove that he felt coerced by the fact that Agent Dawson sat "uncomfortably close" to him during the interview, a distance that Mr. Anaya estimated to be two to three feet. Sitting next to a person at a distance of two to three feet inside an office that is only 10 feet by 8 feet and has a desk and three chairs in it does not strike the court as unusual. Furthermore, Mr. Anaya never indicated that Agent Dawson loomed over the top of him, threatened him physically, or coupled his close physical proximity with a raised voice or threatening words. Again, given the totality of facts surrounding this interview, the court cannot conclude that Agent Dawson's sitting two to three feet away from Mr. Anaya served to overbear his free will.

Finally, the court notes that one of the subtle elements of coercion found by Dr. Manlove was that the agents promised leniency. The court notes that the agents' only testimony on this point at the hearing was that they told Mr. Anaya that if he cooperated, they would pass along the fact that he had cooperated to the prosecutor. The agents never represented that this would result in no charges being filed, lesser charges being filed, or a less drastic punishment. In any case, the Eighth Circuit has indicated that promises of leniency do not necessarily render a confession involuntary. <u>Kilgore</u>, 58 F.3d at 353. Here, given the totality of the circumstances, the fact that the agents

told Mr. Anaya that they would pass along to the prosecutor the fact that he

had cooperated does not serve to render Mr. Anaya's statement involuntary.[8]

It cannot be denied that the very fact of being questioned by law

enforcement while in custody is inherently coercive, a fact which prompted the

Supreme Court to establish the prophylactic rule in <u>Miranda</u>.  <u>Miranda</u>, 384

U.S. at 444.  In addition, the court agrees that submitting to a polygraph

examination may also present a somewhat coercive condition.  So, too, the fact

that there is a racial imbalance between interrogator and suspect.  But

Mr. Anaya cites to no case and this court is not aware of such a case that has

found coercion based only on these factors.

Instead, the court is required to consider all relevant factors and to

determine whether, under all factors, the conclusion can be reached that the

defendant's free will was overborne.  Considering the totality of circumstances

surrounding the March 12, 2009, interview of Mr. Anaya, the court concludes

that the agents did not overbear his free will and that the statements

Mr. Anaya made on this occasion were freely and voluntarily made.

Accordingly, the court recommends that this portion of Mr. Anaya's motion to

suppress be denied.

_____

[8]Mr. Anaya's counsel's suggestion in his brief on his motion to suppress that Mr. Anaya may have been intoxicated at the time of the March 12, 2009, interview appears specious.  Mr. Anaya himself told Dr. Manlove that he had not drunk any alcohol for two days prior to the interview and that, on the occasion when he did drink two days prior, he consumed only two alcoholic drinks.  <u>See</u> Exhibit 101, page 6.

**3.     Whether Mr. Anaya Voluntarily Waived His <u>Miranda</u> Rights**

Mr. Anaya also argues that his waiver of his <u>Miranda</u> rights was not voluntary, knowing, or intelligent. Neither party disputes that <u>Miranda</u> warnings were given prior to the questioning in this case.  Thus, whether Mr. Anaya' statements should be suppressed pursuant to the rule in <u>Miranda</u> depends on whether Mr. Anaya effectuated a valid waiver of his <u>Miranda</u> rights prior to giving his statement to Agents Dawson and Blackburn.

It is the government's burden to prove that a defendant's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent.  <u>United States v. Caldwell</u>, 954 F.2d 496, 508 (8th Cir. 1992).  "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  <u>Miranda</u>, 384 U.S. at 475.  The government must prove that a waiver was voluntary, knowing, and intelligent by a preponderance of the evidence.  <u>Connelly</u>, 479 U.S. at 168.

Whether Mr. Anaya effectively waived his <u>Miranda</u> rights requires two inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"Only if the 'totality of circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Jones, 23 F.3d at 1313.  Examination of the totality of circumstances includes, but is not limited to, such considerations as the "background, experience, and conduct" of the defendant.  Jones, 23 F.3d at 1313 (quoting United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

### a.    Whether Mr. Anaya's Miranda Waiver was Voluntary

The same analysis concerning the voluntariness of a defendant's confession under the Fifth Amendment applies to determine whether a defendant's Miranda waiver was voluntary.  See Makes Room for Them, 49 F.3d at 415 (a court must consider the conduct of the police when determining whether defendant's will was overborne with regard to either his confession or his Miranda waiver).  Under either analysis, "[a]bsent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired *because of* coercive police conduct," a waiver of Miranda rights will be considered voluntary.  Spring, 479 U.S. at 574 (emphasis supplied).  The court has already determined that Agents Dawson and Blackburn did not coerce or threaten Mr. Anaya in any way to elicit his statements , and that there was no coercion or overreaching.  The facts

49

surrounding Mr. Anaya's <u>Miranda</u> waiver are even more compelling as the coercive aspect of undergoing the polygraph exam was not a factor at all in the <u>Miranda</u> waiver as the exam was conducted *after* Mr. Anaya waived his <u>Miranda</u> rights.  Therefore, the court concludes that the agents did not coerce Mr. Anaya into waiving his <u>Miranda</u> rights.  Mr. Anaya freely and voluntarily waived his <u>Miranda</u> rights.

### b. Whether Mr. Anaya's <u>Miranda</u> Waiver was Knowing and Intelligent

With regard to this second inquiry, whether Mr. Anaya made a knowing and intelligent waiver, "[a] waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right…" <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005).  Although police coercion is a necessary predicate to finding that a waiver was involuntary, it is *not* determinative on the separate issue of whether the waiver was knowing and intelligent.  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998).

"As a general matter … an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one…" <u>United States v. Garlewicz</u>, 493 F.3d 933, 936 (8th Cir. 2007). "Once it is determined that a suspect's decision not to rely on his rights was

uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Moran, 475 U.S. at 422-23.

The Court in Miranda explained further:

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it– the threshold requirement for an intelligent decision as to its exercise.  More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. . . .

> The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.

Miranda, 384 U.S. at 467-69.

Mr. Anaya argues that his lack of legal sophistication and anxiety disorder vitiated his ability to knowingly and intelligently waive his constitutional rights.   The Eighth Circuit decision in Turner, 157 F.3d 552, lends guidance.

In Turner, police officers stopped Turner's vehicle after observing erratic driving.  Id. at 553.  Officers administered field sobriety tests to Turner and concluded that he was under the influence of some drug other than alcohol.

51

Id. at 554.  After arresting Turner and advising him of his Miranda rights,

officers transported him to jail and conducted a urine test, which came back

positive for phencyclidine (PCP).  Id.

Officers again advised Turner of his Miranda rights and Turner signed a

waiver form, initialing each admonition.  Id.  During the interview, Turner

appeared cooperative; however, he subsequently exhibited bizarre behavior.  Id.

Upon examination, several psychiatrists diagnosed Turner with a having a

PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-

average to borderline range.  Id.  Turner moved to suppress the statements he

made to law enforcement, arguing that, because of his low IQ, PCP

intoxication, and mental illness, he did not have the mental capacity to

intelligently and knowingly waive his constitutional rights.  Id.

The court rejected this argument, finding the following facts persuasive:

Turner was cooperative during the interview; he reviewed and initialed each

admonition of the waiver form; he agreed to answer questions; he gave accurate

information; and he appeared intelligent enough to understand his rights.  Id.

at 555.  See also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An

express written or oral statement of waiver of the right to remain silent or of the

right to counsel is usually strong proof of the validity of that waiver..."};

Rohrbach, 813 F.2d at 145 (in determining that defendant's waiver was

knowing and intelligent, the court found persuasive the fact that his history of

arrests, convictions, and reform school made him quite familiar with the criminal justice system). The Turner court concluded that Turner's waiver of his Miranda rights was knowing and intelligent. Turner, 157 F.3d at 557.

The advisement of rights given by Agent Dawson in this case to Mr. Anaya fully and fairly described Mr. Anaya' Miranda rights. Furthermore, it did so in plain and simple language. The evidence shows that Mr. Anaya graduated from high school with an above-average grade point average of 3.2. The language used by Agent Dawson to describe Mr. Anaya' Miranda rights was appropriate for a high school graduate to understand. Mr. Anaya indicated he *did* understand his rights. Furthermore, Agent Dawson and Agent Blackburn's colloquies with Mr. Anaya on a variety of topics revealed a level of cooperation and intelligence on Mr. Anaya' part sufficient to support the conclusion that, when Mr. Anaya said he understood his rights, he actually did.

It is true that Agent Dawson did not specifically tell Mr. Anaya that he was there to investigate potential federal charges, as opposed to tribal charges, for which the maximum penalty would be that of a misdemeanor. The Eighth Circuit has rejected the argument "that Miranda requires a specific warning on the potential sentencing consequences of waiving the right to remain silent." United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995). A defendant "must show more than that he misunderstood the extent of his waiver or its ramifications..." United States v. Sanders, 341 F.3d 809, 817 (8th Cir. 2003).

53

"Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel." United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998).

In United States v. Kilgore, 58 F.3d 350 (8th Cir. 1995), the Eighth Circuit held that the defendant's confession was voluntary even if he "was confused and confessed to the crime on the mistaken belief that he had been promised leniency (or even if he had been promised some form of leniency)." Id. at 353. In Spring, the Supreme Court found that the agents' failure to tell Spring at the inception of the interview that they were going to ask him questions about his involvement in a murder did not invalidate Spring's knowing and intelligent Miranda waiver. Spring, 479 U.S. at 574.

Here, Agent Dawson informed Mr. Anaya that he was there to interview him regarding the victim's allegations of sexual abuse. Furthermore, Agent Dawsoin informed Mr. Anaya that he was an FBI agent. Agent Dawson was under no legal obligation to tell Mr. Anaya that federal charges would be filed if criminal acts were discovered or what the possible penalties for those charges might be. Indeed, until the investigation was completed, it would be nearly impossible for Agent Dawson to determine what charges, if any, were supported by the evidence. Without being able to determine if any federal charges were supported by the evidence, it would also have been impossible for Agent Dawson to determine what the penalties for those charges might be. Agent

54

Dawson's failure to tell Mr. Anaya that he faced potential federal charges and the penalties for those charges does not render Mr. Anaya's waiver of his Miranda rights invalid. Spring, 479 U.S. at 574; Sanders, 341 F.3d at 817; Peck, 161 F.3d at 1174; and Kilgore, 58 F.3d at 353.

## CONCLUSION

This court respectfully recommends that Mr. Anaya's motion to suppress [Docket No. 21] be denied in all respects.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated April 19, 2010

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE