UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 09-50055-01-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER ADOPTING |
| vs. | ) | MAGISTRATE JUDGE'S |
| | ) | REPORT AND |
| CHARLES DEAN ANAYA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

Defendant, Charles Dean Anaya, is charged with one count of aggravated

sexual abuse in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), and 1153. Anaya

moves to suppress statements he made to law enforcement officers on

December 10, 2008, and March 12, 2009. The court referred Anaya's motion to

suppress to Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C.

§ 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy

recommended that this court deny Anaya's motion to suppress. Anaya objects

to Magistrate Judge Duffy's factual and legal findings that the December 10,

2008, interview was not a custodial interrogation; that the Miranda advisements

on March 12, 2009, were complete and accurate; that Anaya's Miranda waiver

on March 12, 2009, was voluntary, knowing, and intelligent; that Anaya's

statements were voluntary; and that Anaya's statements on December 10, 2008,

and March 12, 2009, should not be suppressed. The government has no

objection to Magistrate Judge Duffy's report and recommendation. After a de novo review of Magistrate Judge Duffy's report and recommendation and a review of the record, the court adopts the report and recommendation as supplemented herein.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1), "when a party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, '[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.' " United States v. Lothridge, 324 F.3d 599, 600 (8th Cir. 2003) (quoting 28 U.S.C. § 636(b)(1)); see also Fed. R. Civ. P. 72(b) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

## BACKGROUND

The court agrees with Magistrate Judge Duffy's detailed and exhaustive findings of fact and adopts them in full. Because Anaya makes a number of factual assertions in his objections to Magistrate Judge Duffy's report and recommendation, the court makes the following findings of fact. Anaya is charged with aggravated sexual abuse of the daughter of his former girlfriend. The inappropriate sexual contact allegedly occurred between 2003 and 2004, when the alleged victim was eleven or twelve years old.

On December 10, 2008, Federal Bureau of Investigation (FBI) agents Charles Blackburn and Sherry Rice went to the Anaya's place of employment, the Cangleska Women's Shelter in Kyle, South Dakota, to interview Anaya about this allegation. Anaya was working outside when the agents arrived. Agent Blackburn approached Anaya, identified himself as an FBI agent, and told Anaya that he would like to talk to him for a few minutes inside the building. Anaya agreed to talk with Agent Blackburn. On the way to the building, Agent Blackburn told Anaya that he was not under arrest and that he would not be arrested at the end of the interview. Agent Blackburn did not notice anything out of the ordinary about Anaya's demeanor and appearance.

When Agent Blackburn and Anaya got inside the building, Agent Blackburn introduced Anaya to Agent Rice and informed him again that he was not under arrest and was not going to be arrested at the end of the interview. Agent Blackburn also informed Anaya that the interview was entirely voluntary, that Anaya did not have to talk to the agents if he did not want to, and that he could leave the interview room at any time. Neither Agent Blackburn nor Agent Rice advised Anaya of his <u>Miranda</u> rights. Agent Blackburn did not suggest that Anaya should contact an attorney or inform Anaya of the maximum penalty for the offense alleged against him.

The interview took place in an office inside the Cangleska Women's Shelter. The room was about ten-feet by ten-feet and contained a small desk and some chairs. It had an exterior window and a door to the rest of the

building.  The door was unlocked throughout the interview, but Agent Blackburn does not recall if he informed Anaya that the door was unlocked. Agent Blackburn did show Anaya the door of the room.  Agent Blackburn was dressed in khaki or cargo pants, a long-sleeved, button-up shirt, and a jacket the morning of the interview.  Neither Agent Blackburn nor Agent Rice had their weapons displayed during the interview.

Agent Blackburn explained to Anaya that there had been an allegation of sexual abuse made against him and that the agents would like to speak with him regarding the allegation.  At this point, Agent Blackburn noticed that Anaya's hands were shaking.  Agent Blackburn asked Anaya about his hands, and Anaya indicated that his hands were trembling because he had consumed too much caffeine that morning.  Agent Blackburn continued the interview with Anaya.  Anaya told the agents about his relationship with the alleged victim's mother and denied having any kind of sexual contact with the alleged victim. Agent Blackburn and Agent Rice asked Anaya why the alleged victim would make up such an allegation if it were not true, and Anaya did not provide an explanation.  Agent Rice asked the defendant if there was anything that may have happened that would cause the alleged victim to think that the defendant touched her in an inappropriate manner.  Anaya recalled that he used to engage in tickling matches with the alleged victim's mother and the alleged victim, and that his hands may have gone other places during one of those matches. Shortly after this statement, the interview ended, and Anaya told Agent

Blackburn he would continue to think about the time he dated the alleged victim's mother and would call Agent Blackburn if he could remember any further details. Agent Blackburn gave Anaya his business card. Agent Blackburn did not ask Anaya if he would be interested in taking a polygraph exam during this interview.

The interview lasted from about 11:55 a.m. to 12:49 p.m. The agents used conversational tones throughout the interview. Neither agent raised his or her voice or shouted, even when they asked Anaya why the victim would allege that she was sexually abused if it was not true.

Agent Blackburn's next interaction with Anaya was on February 2, 2009. On that day, Agent Blackburn went to a residence located near Kyle, South Dakota, to locate Anaya and to ask him if he was willing to submit to a polygraph exam. Agent Blackburn met with Anaya in the driveway of the residence. They sat in the front seat of Agent Blackburn's car. Agent Blackburn asked Anaya if he would be willing to take a polygraph exam, and Anaya agreed. Agent Blackburn does not remember if Anaya asked what a polygraph exam was or if he explained it. Agent Blackburn did not discuss the admissibility or reliability of a polygraph exam with Anaya. Agent Blackburn denies stating that a polygraph exam is 99 percent accurate. Agent Blackburn asked Anaya if he was taking any medications or had any other medical conditions. Anaya informed Agent Blackburn that he gets panic attacks and previously took an antidepressant, but that he stopped taking it seven years

ago. Agent Blackburn told Anaya that he would contact him to arrange the date and time of the polygraph exam. Agent Blackburn was dressed casually and did not display his weapon during this conversation.

Agent Blackburn arranged to conduct the polygraph exam on March 12, 2009, at the Bureau of Indian Affairs (BIA) office in Pine Ridge, South Dakota. He asked Anaya if he needed transportation from Kyle to Pine Ridge, and Anaya indicated that he would need a ride to Pine Ridge. Agent Blackburn and Anaya met at the Kyle Police Department at about 8:20 a.m. on March 12, 2009. Agent Blackburn greeted Anaya and observed that he was calm. He did not observe any shaking or trembling. Agent Blackburn asked Anaya to ride in the front seat of his car and received Anaya's permission to pat him down to check for weapons. Agent Blackburn patted down the exterior of Anaya's clothing.

Before starting the car, Agent Blackburn informed Anaya that he was not under arrest and would not be arrested at the end of the interview and polygraph exam, that the interview and polygraph exam were entirely voluntary, that Anaya did not have to go with Agent Blackburn, and that if Anaya wished to end the interview or polygraph exam at any time, Agent Blackburn would take him home. During the 50-minute drive, Agent Blackburn and Anaya talked about Anaya's construction work and his time in Roswell, New Mexico. The tone of the conversation was calm and conversational. Anaya was not handcuffed, and Agent Blackburn did not smell any alcohol on Anaya.

Agent Blackburn and Anaya arrived at the BIA office at about 9:14 a.m. and went into the private office where the interview took place at about 9:30 a.m. Agent Blackburn introduced Anaya to Agent Todd Dawson, who was waiting in the interview room. The interview room was a private office within the BIA office on the second floor of the building. The office was approximately eight- to ten-feet by ten-feet and contained a desk and some chairs. The polygraph instrument, which consists of a laptop computer, a digital acquisition system box, electrodermal activity plates, finger plates, a blood pressure cuff, two pneumograph tubes, and a motion sensor, was on the desk. The office had an exterior window that was covered by a shade. The door was shut throughout the interview and polygraph exam. Agent Blackburn was wearing casual clothing and his weapon was not exposed. Agent Dawson was wearing a suit and tie and did not have a weapon.

Agent Dawson explained that he would be conducting a polygraph exam. He did not discuss the reliability or admissibility of a polygraph exam, and he denies that he told Anaya that the results of a polygraph exam are 99 percent accurate. Agent Dawson observed that Anaya seemed calm, collected, and alert. At the beginning of the interview, Agent Dawson and Anaya sat in the chairs in front of the desk, with Anaya sitting closest to the door, and Agent Blackburn stood in the corner of the room against the wall. Agent Dawson did not smell alcohol or suspect that Anaya had been drinking or using other controlled

substances.  He did not test Anaya's blood, breath, or urine for controlled substances.

Agent Dawson advised Anaya of his <u>Miranda</u> rights by showing him an advice of rights form on the laptop computer.  Agent Dawson asked Anaya to read the first line of the advice of rights form aloud to demonstrate that he could read.  Anaya did not have any problems reading the line.  Then Agent Dawson read each right one-by-one, explained it in other words, and asked Anaya to initial next to each right using a digital signature pad if he understood the right and did not have any questions about it.  After initialing each right, Anaya signed the bottom of the form.[1]  Then Agent Dawson went over a

---

[1] The advice of rights form says,

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

polygraph consent form with Anaya.  He read the form out loud, explained that

the exam would be about whether Anaya touched the alleged victim's vagina in

a sexual manner underneath her clothing, explained Anaya's rights, and had

Anaya initial next to each right.[2]  Agent Dawson also asked Anaya to initial

certain boxes on the form to indicate that Anaya understood that the room did

not contain an observation device and that the examination would not be

monitored and recorded.  Then Anaya signed the bottom of the form.  Anaya

indicated that he understood the form, and Agent Dawson did not observe

anything that made him doubt that Anaya understood the form.  Agent

Blackburn watched Anaya sign the advice of rights and polygraph consent forms

and observed that Anaya did not indicate that he had questions or did not

understand his rights.  Agent Blackburn perceived Anaya to be calm and

relaxed.  After Anaya signed both forms, Agent Blackburn left the room.

Agent Dawson continued the "pretest interview" by asking Anaya

questions about his background.  Anaya indicated that he graduated from high

---

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

Exhibit 1.

[2] The polygraph consent form advises Anaya of the following rights: "You have the right to refuse to take the polygraph test;" "If you agree to take the polygraph test, you have the right to stop the test at anytime;" and "If you agree to take the polygraph test, you have the right to refuse to answer any individual question."  Exhibit 3.

school in 1990 and had worked as a construction worker and carpenter. Anaya
also stated that he had chronic shoulder pain, but was not in serious pain at
the time of the interview. Anaya stated that he had occasional anxiety attacks,
but that he was not having an anxiety attack at the time and had not had any
in the past few weeks or months. Anaya said that he had attempted suicide by
taking Tylenol tablets in 2001. Anaya stated that his current emotional health
was okay and that he was not seeing a psychologist or psychiatrist. Anaya was
not taking any over-the-counter drugs and slept seven hours the night before.
During this portion of the interview, Agent Dawson did not see anything that
would indicate that Anaya was having an anxiety attack. Anaya's hands were
not shaking, he answered questions and followed the conversation very well,
and he was not sweating. Agent Dawson told Anaya the nature of the charges
against him and went over the questions Anaya would be asked during the
polygraph exam.[3]

At about 10:37 a.m., Agent Dawson began the polygraph exam. He
attached the polygraph components to Anaya. He did not notice any change in
Anaya's physical demeanor or behavior. During the exam, Agent Dawson moved
behind the desk so that he was out of Anaya's field of vision. Agent Dawson
was seated to the side and back of Anaya. Anaya denied touching the alleged

---

[3] The relevant questions were, "[d]id you deliberately touch that girl's
vagina underneath her clothing?" and "[d]id you deliberately touch that girl's
vagina underneath her clothing at Marlene's trailer?"

victim each time he was asked. Agent Dawson determined that Anaya was being deceptive as to the relevant questions. The exam was completed at 10:56 a.m.

Agent Dawson walked around the desk so he could talk to Anaya face-to-face and informed Anaya that he did not pass the exam. Agent Dawson sat in the chair that he sat in at the beginning of the interview. He did not raise his voice, threaten Anaya, or make any promises to Anaya. Agent Dawson told Anaya that he was not there to judge him and suggested that there may be reasons to explain how the alleged incident happened, such as intoxication. At some point after informing Anaya that he did not pass the exam, Agent Dawson removed the polygraph components. Anaya's demeanor did not change significantly during this conversation, but he looked down and was quiet. He was not shaky. Eventually, Anaya made an admission, and Agent Dawson asked questions to fill in the details of the admission. Agent Dawson denies that he demonstrated on his own body what might have happened or that Anaya asked Agent Dawson what he wanted to hear.

Agent Dawson asked Agent Blackburn to come back into the interview room at 11:45 a.m. Agent Dawson sat in the chair behind the desk, and Agent Blackburn sat in the other chair on the same side of the desk as Anaya about three or four feet away from him. Agent Blackburn did not notice any shakiness or other change in Anaya's demeanor. After Agent Blackburn entered the room, Agent Dawson summarized Anaya's admission for Agent Blackburn.

He asked Anaya to correct him if he relayed any information incorrectly.  Anaya stated that each piece of information Agent Dawson relayed was true.  After ten to fifteen minutes, Agent Blackburn told Anaya that he could produce a written statement, record an oral statement, or do nothing.  Anaya said he would like to make a tape recorded statement so that his own words could be heard.

Anaya recorded a statement from 11:59 a.m. until 12:07 p.m.  A recording of Anaya's statement was provided to the court.  Anaya's voice was steady and calm throughout the recording.  Both agents testified that Anaya's demeanor and tone on the tape were representative of his demeanor and tone throughout the interview.  At the end of the recording, Anaya was asked how he was treated that day, and he said, "Both of you guys have been pretty well professional about it, if I can say.  I was treated fairly."  See Exhibit 2.  He denied that the agents had made any promises or threats to get him to make a statement.  While Anaya was recording the statement, Agent Blackburn did not observe any physical symptoms that indicated to him that Anaya was nervous or having some type of anxiety attack.  Agent Dawson did not ask Anaya if he was suffering from an anxiety attack.  After Anaya finished making his statement, Agent Dawson told him that he would pass on to the prosecutor the fact that Anaya was cooperative and truthful during the interview.

Agent Blackburn and Anaya left the BIA office at 12:11 p.m.  Anaya rode in the front seat of Agent Blackburn's car.  Agent Blackburn asked Anaya if there was anything he could remember that narrowed down the time frame of

the incident he described in his recorded statement. Anaya explained that the incident must have happened during the spring or summer of 2003 because he remembered loaning the alleged victim's mother a vehicle that day. Agent Blackburn and Anaya did not have any more substantive discussions for the rest of the drive to Kyle. Agent Blackburn observed that Anaya displayed the same tone and demeanor during the ride home. Agent Blackburn dropped Anaya off in Kyle.

From the time Agent Blackburn picked Anaya up in Kyle until the time he dropped him off, Anaya never asked Agent Blackburn to stop the interview and never asked for an attorney. Neither Agent Blackburn nor Agent Dawson made any threats or promises to Anaya. Agent Blackburn did not say that it was in Anaya's best interest to fully cooperate. There was never any sign that Anaya was nervous, anxious, or shaky. Neither agent informed Anaya of the possible penalties for sexual abuse.

Dr. Stephen Manlove, a psychiatrist, conducted a forensic psychiatric evaluation of Anaya. See Exhibit 101. He interviewed Anaya on three separate occasions. Anaya reported that he grew up in and graduated from high school in New Mexico with a 3.2 grade point average. He had a family history of mental illness. Anaya had maintained employment and could function reasonably well as an adult in the working world. Anaya previously took anti-anxiety medications but was not on them at the time of the interviews with law enforcement. He had a history of depression that he managed with work and

13

exercise.  He also had problems with anxiety attacks, which began in December

2005.  During these attacks, he experienced heart palpitations, shakiness,

sweating, and paranoid and lonesome feelings.  Anaya reported that he

experienced a panic attack during the March 12, 2009, interview.  Anaya had

been arrested for public intoxication around twenty times, disorderly conduct

around ten times, and resisting arrest around five to ten times.

Anaya told Dr. Manlove that Agent Blackburn told him in February 2009

that polygraph exams are 99 percent accurate.  Anaya also reported that he had

two alcoholic drinks the Monday before the March 12, 2009, interview (which

was on a Wednesday).  He did not have anything to drink the day before the

interview.  He slept two to three hours that night.  Anaya reports that during

the March 12, 2009, interview, Agent Dawson moved and sat two to three feet

from Anaya while asking questions about the alleged victim.  Anaya reports that

at this point, he had a panic attack and felt he had to get the interview over

with because he was worried he would faint.  He told Agent Dawson what he

wanted to hear.  Anaya reported that both Agent Blackburn and Agent Dawson

were sitting uncomfortably close to him.

At the evidentiary hearing, Dr. Manlove testified in general about false

confessions and psychological coercion.  Based on his interviews with Anaya, he

opined that Anaya falsely confessed because he believed that his guilt had been

established beyond any conceivable doubt because he had been told that the

polygraph test was 99 percent accurate; because Anaya experienced a panic

attack during the interview that made it impossible for him to be in that situation any longer; because Anaya experienced a marked imbalance of power between himself and the two white FBI agents in a government-owned building; and because Anaya felt physically intimidated by Agent Dawson's physical posturing. Dr. Manlove testified that Anaya could have had a panic attack that was not apparent to the FBI agents.

Anaya filed a motion to suppress both his December 10, 2008, and March 12, 2009, statements. Magistrate Judge Duffy recommended that Anaya's motion to suppress be denied because Anaya was not in custody on December 10, 2008, the advisement of rights given to him on March 12, 2009, was complete and accurate, his March 12, 2009, statement was voluntary, and Anaya voluntarily waived his Miranda rights on March 12, 2009.

## DISCUSSION

### I.  December 10, 2008, Statements

Anaya argues that his December 10, 2008, statements should be suppressed because he was not advised of his Miranda rights before the interview. Magistrate Judge Duffy recommended that Anaya's motion be denied because Anaya was not subject to custodial interrogation on this date. Anaya objects to Magistrate Judge Duffy's recommendation, arguing that Anaya was ordered to answer questions and did not feel free to decline, Anaya was never advised of his right to remain silent, the questioning was spearheaded by law enforcement, Anaya was the focus of the investigation, the interview was started

and dominated by law enforcement, Anaya was not advised to seek the advice of an attorney, Anaya did not know that the subject matter of the investigation could expose him to a minimum of thirty years in prison, Anaya was interrogated in a closed office by two law enforcement officers of a different race, and the government cannot prove that Anaya was not subject to some physical or mental impairment that led him to believe he was in a custodial setting.

Miranda requires that an individual be advised of the privilege against self-incrimination and the right to the assistance of counsel prior to questioning when the suspect is (1) subject to interrogation and (2) in custody. See United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). The parties agree that the December 10, 2008, interview constituted interrogation. Thus, the only issue is whether Anaya was in custody at the time of the interview. A suspect is in custody if, considering the totality of the circumstances, " 'a reasonable person in the suspect's position would have understood his situation' to be one of custody." Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). Common indicia of custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349.  These indicia are not exhaustive and should not be applied

ritualistically.  United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir.

2005).  The Eighth Circuit has said that the " 'most obvious and effective means

of demonstrating that a suspect has not been taken into custody' [is] an express

advisement that the suspect is not under arrest and that his participation in

any questioning is voluntary."  Id. (quoting United States v. Czichray, 378 F.3d

822, 826 (8th Cir. 2004)).  "No governing precedent of the Supreme Court or

[the Eighth Circuit] has yet held that a person was in custody after being clearly

advised of his freedom to leave or terminate questioning."  Id. (internal

quotation omitted).

Here, as Magistrate Judge Duffy discussed, Agent Blackburn twice

informed Anaya that the questioning was voluntary and that he was not under

arrest.  He also told Anaya that he did not have to talk to the agents and could

leave the interview room at any time.  The interview took place in an unlocked

office, and Agent Blackburn showed Anaya the exit before the interview began.

Anaya agreed to talk with Agent Blackburn after Agent Blackburn identified

himself as an FBI agent.  Agent Blackburn and Agent Rice used conversational

tones throughout the interview.  They did not raise their voices or shout.

Although Agent Rice asked Anaya why the alleged victim would make an

allegation of sexual abuse if it was not true, this is not the type of strong arm

tactic or deceptive strategy that would render the setting custodial.  The

interview only lasted about 55 minutes.  Finally, Anaya was not placed under

arrest at the end of the interview.  Rather, he indicated that he would think more about the allegation and contact Agent Blackburn if he remembered any further details.  These facts all suggest that a reasonable person would not have believed that he was in custody during the December 10, 2008, interview.

In light of these facts, with heavy weight given to the fact that Agent Blackburn told Anaya multiple times that the interview was voluntary, that he was not under arrest, and that he was free to leave at any time, the court finds that Anaya's assertions that the interview was spearheaded and dominated by law enforcement, that Anaya did not know that the subject matter of the interrogation could expose him to a minimum of thirty years in prison, that Anaya was interrogated in a closed office by two officers of a difference race, and that Anaya was the focus of the investigation do not show that a reasonable person would have believed that he was not free to leave.  Anaya has provided no authority for his assertion that a suspect's lack of awareness of the maximum penalty of a crime (of which the suspect has not been charged) has any bearing on his perception of whether he was free to depart.  Rather, Eighth Circuit authority suggests that a suspect's lack of awareness of a certain fact is irrelevant to the question of whether he was in custody.  See id. (finding that agent's plan to arrest suspect after the interrogation did not affect the issue of whether the suspect was in custody because the suspect was not aware of the plan).  Further, Anaya has not asserted that the racial differences between himself and the agents or his awareness that the alleged victim had made

allegations against him contributed to his perception of the interview as coercive or voluntary. "[T]he fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." Griffin, 922 F.2d at 1348 (quoting United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989)). There is no indication that Anaya's awareness of the allegations against him contributed to his sense of custody. "In any event, the fact that the purpose of the questioning is to further focus the investigation on the defendant does not weigh heavily in [the] analysis." Id. (internal quotation omitted).

Further, the court finds no evidence to support Anaya's assertions that he was ordered to answer questions and did not feel free to decline or that he may have been subject to some physical or mental impairment that led him to believe he was in a custodial setting. Indeed, Agent Blackburn twice told Anaya that the questioning was voluntary before it began, and Anaya agreed to go forward with the questioning. The only indication that Anaya suffered from a physical or mental impairment was the shaking of his hands. Anaya explained to the agents that his hands were trembling because he drank too much caffeine that day. Finally, Anaya argues that he was in custody because he was not advised of his right to remain silent or that he should seek the advice of an attorney. These facts do not show that Anaya was in custody. Rather, they are rights about which the agents would have been required to advise Anaya if he

19

actually were in custody. Overall, Anaya's assertions about the December 10, 2008, interrogation do not show that Anaya was in custody during this interview.

Under these facts, the court finds that Magistrate Judge Duffy correctly found that considering the totality of the circumstances, a reasonable person in Anaya's position would not have understood himself to be in custody during the December 10, 2008, interview. Thus, Agent Blackburn and Agent Rice were not required to advise Anaya of his Miranda rights prior to questioning him, and the court adopts Magistrate Judge Duffy's recommendation that Anaya's motion to suppress the statements he made in the December 10, 2008, interview be denied. See Griffin, 922 F.2d at 1347 (stating that advisement of Miranda rights only required where defendant was subject to custodial interrogation).

II.    **March 12, 2009, Statements**

Anaya argues that his March 12, 2009, statements should be suppressed because he was not properly advised of his Miranda rights, he did not voluntarily waive these rights, and his statements were not voluntary. Magistrate Judge Duffy recommended that Anaya's motion to suppress be denied. Anaya objects to Magistrate Judge Duffy's recommendation, making a number of factual assertions about the circumstances of the March 12, 2009, interrogation.[4]

_____

[4] Anaya's objections to Magistrate Judge Duffy's report and recommendation regarding the March 12, 2009, statements consist of a general

20

**A.      Completeness and Accuracy of Advisement of Rights**

Anaya argues that he was not adequately advised of his <u>Miranda</u> rights.

<u>Miranda</u> requires that prior to any questioning in a custodial setting, the

suspect "must be warned that he has a right to remain silent, that any

statement he does make may be used as evidence against him, and that he has

a right to the presence of an attorney, either retained or appointed." <u>Miranda v.

Arizona</u>, 384 U.S. 436, 444 (1966).  The purpose of the warning that anything

the suspect says can be used against him in court is to ensure that the suspect

is "aware of the privilege against self-incrimination, under[stands] the

consequences of waiving this privilege, and recognize[s] the adversarial nature

of the proceedings." <u>United States v. Johnson</u>, 47 F.3d 272, 277 (8th Cir.

1995).  <u>Miranda</u> does not require a specific warning on the potential sentencing

consequences of waiving the rights to remain silent or to be represented by

counsel.  <u>Id.</u>; <u>United States v. Peck</u>, 161 F.3d 1171, 1174 (8th Cir. 1998) ("Lack

of awareness of the potential adverse impact of statements is not sufficient in

itself to invalidate a waiver of the right to counsel.").

Anaya argues that he was never advised of his <u>Miranda</u> rights and that

the <u>Miranda</u> warnings were incomplete because Agent Blackburn and Agent

---

statement of the law regarding the voluntariness of confessions and waiver of
<u>Miranda</u> rights and a list of nineteen conclusory factual assertions.  Anaya did
not indicate which facts go to the adequacy and completeness of the <u>Miranda</u>
advisement, the voluntariness of the confession, and the validity of Anaya's
waiver of his <u>Miranda</u> rights, so the court is left to guess which facts Anaya
believes are relevant to each issue.

Dawson did not inform him of the context in which the investigation was taking place, i.e., an investigation of a federal offense carrying a minimum penalty of thirty years in prison. Anaya's assertion that he was never advised of his Miranda rights is utterly unsupported by the record. According to both agents' testimony, which the court finds credible, Agent Dawson went over the advice of rights form with Anaya one line at a time and explained each of the rights listed on the form. Anaya initialed next to each right as they discussed it. The advice of rights form shows that Anaya was advised that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to seek the advice of a lawyer before he answered any questions, that he had the right to have a lawyer with him during questioning, that a lawyer would be appointed for him if he could not afford one, and if he decided to answer questions without a lawyer present, he had the right to stop at any time. The advice of rights form shown to Anaya encompasses all of the warnings required by Miranda. Anaya was also advised that he had the right to refuse to take the polygraph exam, that he had the right to stop the polygraph exam at any time, and that he had the right to refuse to answer any individual question during the polygraph exam. Although the polygraph consent form does not reiterate Anaya's rights to consult with a lawyer and to have a lawyer present during the polygraph exam, the general advisement of rights, provided to Anaya at the same time as the polygraph consent form, adequately informed Anaya that he

had a right to consult a lawyer before answering any questions and to have a lawyer present during the upcoming questioning.

Anaya's assertion that the advisement of rights was inadequate because he was not advised of the potential federal charges and their minimum penalties is also unavailing. The advisement that anything Anaya said could be used against him in court was sufficient to advise him of the consequences of answering questions without a lawyer. As Magistrate Judge Duffy explained, Agent Dawson was not required to advise Anaya that he was the subject of an investigation that may lead to a federal charge that, if Anaya were convicted of it, would subject him to a minimum sentence of thirty years' imprisonment. See Peck, 161 F.3d at 1174; Johnson, 47 F.3d at 277. Anaya was completely and adequately advised of his Miranda rights at the beginning of the March 12, 2009, interview. Anaya's objections to Magistrate Judge Duffy's recommendation that Agent Dawson accurately and adequately advised Anaya of his rights are overruled.

### B.     Voluntariness of Statement

Anaya also argues that his March 12, 2009, statements to Agent Dawson and Agent Blackburn were involuntary. Due process requires that confessions be voluntary. See Brown v. Mississippi, 297 U.S. 278, 285-86 (1936); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process). "The appropriate test for

determining the voluntariness of a confession is 'whether . . . pressures exerted upon the suspect have overborne his will.' " <u>United States v. Meirovitz</u>, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting <u>United States v. Jorgensen</u>, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." <u>Schneckloth</u>, 412 U.S. at 225.  On the other hand, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004).

The voluntariness of a confession is judged by the totality of the circumstances. <u>Id.</u>  Two factors the court must consider are the "conduct of the officers and the characteristics of the accused." <u>Id.</u>  A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity. <u>Colorado v. Connelly</u>, 479 U.S. 157, 164, 167 (1986).  "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." <u>LeBrun</u>, 363 F.3d at 724.  Involuntary statements are inadmissible at trial for any purpose. <u>Michigan v. Harvey</u>, 494 U.S. 344, 351 (1990).

Magistrate Judge Duffy considered all of the facts and circumstances surrounding Anaya's statements, including the three and one-half hour length of the interrogation, the presence of only one agent in the room when Anaya made his first incriminating statement, the advisement that Anaya's

participation in the interview was voluntary and that he could leave at any time, Anaya's intelligence and experience with the criminal justice system, Agent Dawson's and Agent Blackburn's clear denial that they commented on the reliability of the polygraph exam, Anaya's statement that he had not had an anxiety attack in the weeks or months before the interview, the lack of outward indications that Anaya began suffering from a panic attack during the interview, the two- to three-foot proximity of the agents to Anaya in the context of the eight- to ten-foot by ten-foot size of the room, Agent Dawson's statement that he would inform the prosecutor that Anaya was cooperative, the racial imbalance between the agents and Anaya, and the inherently coercive nature of law enforcement questioning and a polygraph exam. In light of all these facts, the court agrees with Magistrate Judge Duffy's conclusion that Anaya's statements on March 12, 2009, were the product of an essentially free and unconstrained choice by Anaya. There is no evidence that Anaya's statements were extracted by threats, violence, or express or implied promises sufficient to overbear Anaya's will and critically impair his capacity for self-determination. See LeBrun, 363 F.3d at 724.

Anaya objects to Magistrate Judge Duffy's conclusion that his statements were voluntary, arguing that he believed he was not free to leave during the questioning. There is no evidence to support this assertion. Indeed, Agent Blackburn informed Anaya on the drive from Kyle to Pine Ridge that the interview and polygraph exam were entirely voluntary and that if Anaya wished

to end the interview or polygraph exam at any time, Agent Blackburn would take him home. Agent Dawson also explained to Anaya that he did not have to answer any questions and could stop answering questions at any time. Moreover, Anaya indicated to the agents that he understood these rights. There is no evidence that Anaya subjectively believed he was not free to leave. Further, even if Anaya did believe that he was not free to leave, there is no evidence that the agents were aware that Anaya believed he could not leave, and there is no evidence that the agents exploited Anaya's belief. See Connelly, 479 U.S. at 164, 167 (explaining that statement is not involuntary because of incapacity of the defendant in the absence of some coercive police activity). Similarly, Anaya argues that he was questioned in a custodial setting. The court finds that Magistrate Judge Duffy adequately took the inherently coercive nature of the setting of the interview into account in deciding that based on the totality of the circumstances, Anaya's statements were voluntary.

Anaya also argues that the questioning was spearheaded and dominated by law enforcement, that the agents' interrogation tactics resulted in his free and unconstrained will being overborne, that the polygraph technique created psychological pressures and coercion upon Anaya, that Anaya's statements were acquired by trick, promises, and/or threats, and that the use of the polygraph exam was but one facet of a concerted effort by the agents to improperly coerce Anaya to make statements. The court finds that in light of the calm and conversational tone of the interview and polygraph exam, the agents' statements

that the interview was voluntary and could be terminated by Anaya at any time, the lack of physical intimidation or threats by either agent, the lack of promises by either agent, both agents' express denial that they commented on the reliability of the polygraph exam, Anaya's calm demeanor throughout the interview, and the lack of any sign that Anaya was nervous, anxious, or shaky, Agent Dawson's and Agent Blackburn's interrogation tactics were not sufficiently coercive so as to overcome Anaya's capacity for self-determination. Indeed, Anaya stated in the recorded statement that the agents acted professionally and that he was treated fairly. He also denied that the agents made any promises or threats to get him to make a statement. In light of these facts, the court finds that the agents' interrogation tactics did not render Anaya's statements involuntary.

Anaya also argues that the length of the interrogation was such that Anaya's liberty was illegally restrained. The court agrees with Magistrate Judge Duffy that the three and one-half hour length of the interview did not render the circumstances so coercive that Anaya's confession was involuntary. See Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding questioning for six or seven hours not per se coercive). Anaya further argues that he was the focus of the investigation and did not have counsel present. The court finds that these facts, taken in light of the facts as a whole, do not show that Anaya's will was overborne.

Anaya also argues that he was suffering from an anxiety attack during the interview and could not act rationally or voluntarily. Magistrate Judge Duffy considered Anaya's claim that he was suffering from a panic attack at some point during the interview and concluded that Agent Blackburn and Agent Dawson did not engage in coercive activity because there were no outward signs of a panic attack and they were not aware of Anaya's internal experiences. The court agrees with Magistrate Judge Duffy's analysis. Even if Anaya were having a panic attack at the time he made incriminating statements, the government has shown that the agents did not exploit or otherwise take advantage of his mental condition. The law is clear that a statement is not rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity. <u>Connelly</u>, 479 U.S. at 164, 167.

Similarly, Anaya claims that the government is unable to show that Anaya was not subject to a physical or mental impairment that overcame and vitiated his knowing, intelligent, free, and voluntary will because they did not perform any testing or investigation into Anaya's mental or physical health. Anaya has cited no authority for his assertion that in the absence of any indication that a suspect is suffering from a physical or mental impairment, law enforcement officers are required to conduct testing for such impairments. Indeed, in the landmark case of <u>Colorado v. Connelly</u>, the Supreme Court held that the defendant's confession was voluntary where he approached a law enforcement officer and stated, without any prompting, that he had murdered someone,

despite the fact that it was later discovered that the defendant suffered from schizophrenia and only confessed because of his impairment. Id. at 160-62. The officer asked the defendant a few questions, and the defendant denied being under the influence of drugs or alcohol and stated that he had been a patient in several mental hospitals. Id. The Supreme Court held that despite the defendant's mental impairment, his confession was voluntary because the officer did not engage in coercive conduct. Id. at 166. Connelly suggests that law enforcement officers need not conduct testing to determine the physical and mental condition of a suspect in the absence of any indication of a present impairment. Here, Anaya informed Agent Dawson that he had a history of occasional anxiety attacks but that he was not having one at the beginning of the interview and had not had one for the past few weeks or months. Anaya also stated that his current emotional health was okay, he was not in serious pain at the time of the interview, and he had slept seven hours the night before the interview. Anaya did not inform Agent Dawson that he developed anxiety or a panic attack as the interview progressed, and he did not appear shaky or disoriented during the interview. In the absence of any indication that Anaya suffered from a physical or mental impairment that affected his decision to continue answering questions during the interview, the court finds that Anaya's statements were not involuntary because the agents did not perform any tests to determine his mental and physical condition.

Overall, the court agrees with Magistrate Judge Duffy's recommendation that Anaya's March 12, 2009, statements were voluntary. Considering the totality of the circumstances and Anaya's objections to Magistrate Judge Duffy's recommendation, the court finds that the government has shown by a preponderance of the evidence that Anaya's statements were voluntary. Anaya's objections to this portion of Magistrate Judge Duffy's recommendation are overruled.

### C.    Waiver of <u>Miranda</u> Rights

Finally, Anaya argues that he did not voluntarily, knowingly, and intelligently waive his <u>Miranda</u> rights. A criminal suspect may waive his constitutional rights protected by <u>Miranda</u>. But the waiver must be voluntary, knowing, and intelligent, that is, it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the suspect must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994). The " 'totality of circumstances surrounding the interrogation' " guide the determination of whether a waiver was voluntary, knowing, and intelligent. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

The determination of whether a waiver is voluntary for <u>Miranda</u> purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes. <u>United States v. Makes Room for Them</u>, 49 F.3d 410, 414 (8th Cir. 1995). Thus, for the reasons stated

above, the court agrees with Magistrate Judge Duffy's conclusion that Anaya's waiver of his <u>Miranda</u> rights was voluntary.

In determining whether Anaya's waiver was knowing and intelligent, Magistrate Judge Duffy considered the language of the advisement of rights, Anaya's high school diploma and 3.2 grade point average, Anaya's statement that he understood his rights, Anaya's discussion with Agent Dawson and Agent Blackburn on a variety of topics, and Agent Dawson's statement that he was an FBI officer and was there to interview Anaya regarding allegations of sexual abuse and concluded that Anaya did knowingly and intelligently waive his <u>Miranda</u> rights. The court agrees with Magistrate Judge Duffy's analysis.

Anaya argues that his waiver was not knowing and intelligent because he was not advised about the unreliability of polygraphs as a means of discovering the truth, Agent Dawson's implied conclusion that the polygraph exam would be accurate amounted to a misrepresentation of scientific fact, and Anaya was not told that he could not see the exam results or have them independently evaluated. Assuming these facts are true, they do not show that Anaya's waiver of his <u>Miranda</u> rights was unknowing or unintelligent. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987). Rather,

> [t]he Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The <u>Miranda</u> warnings protect this

31

> privilege by ensuring that a suspect knows that he may choose not
> to talk to law enforcement officers, to talk only with counsel
> present, or to discontinue talking at any time. The <u>Miranda</u>
> warnings ensure that a waiver of these rights is knowing and
> intelligent by requiring that the suspect be fully advised of this
> constitutional privilege, including the critical advice that whatever
> he chooses to say may be used as evidence against him.

<u>Id.</u> Thus, "a valid waiver does not require that an individual be informed of all

information 'useful' in making his decision or all information that 'might . . .

affec[t] his decision to confess.' " <u>Id.</u> at 576 (quoting <u>Moran</u>, 475 U.S. at 422).

The Supreme Court has "never read the Constitution to require that the police

supply a suspect with a flow of information to help him calibrate his self-

interest in deciding whether to speak or stand by his rights." <u>Id.</u> at 576-77

(internal quotation omitted). Where additional information would "affect only

the wisdom of a <u>Miranda</u> waiver, not its essential voluntary and knowing

nature," the waiver is not invalid. <u>See id.</u> at 577.

Here, the court finds that the information Anaya wishes he knew before

taking the polygraph exam—that polygraphs are not always reliable, that he

would not be able to see a written report of the results of the exam, and that he

would not be able to have the exam results independently evaluated—is

information that would have been useful in his decision of whether to continue

with the interview and polygraph exam, not information that was required for

Anaya to make a knowing and intelligent waiver of his <u>Miranda</u> rights. Anaya

was advised that he could choose not to talk to the agents, could choose to talk

only with an attorney present, and could discontinue talking at any time.

Anaya was also advised that whatever he said could be used as evidence against him. Anaya initialed next to each of these rights to indicate that he understood them and did not have any questions about them. Neither Agent Blackburn nor Agent Dawson made any affirmative statements about the reliability of the polygraph exam, so Anaya was not misled or tricked into waiving his Miranda rights. The evidence shows that Anaya understood all of the information necessary to knowingly and intelligently waive his Miranda rights, even though he was not advised of some information that may have affected his calculation of the wisdom of answering questions during the polygraph exam.

Anaya also argues that the Miranda warnings were incomplete because the agents did not inform him that they were investigating a federal crime that could expose Anaya to a minimum sentence of thirty years in prison. As noted, Anaya was advised that anything he said could be used against him in court. This warning was sufficient to advise him of the consequences of answering questions without a lawyer, and Agent Dawson was not required to advise Anaya of the nature of the charge being investigated or the possible penalties for that offense. See Peck, 161 F.3d at 1174; Johnson, 47 F.3d at 277; see also Spring, 479 U.S. at 575 (finding that waiver was knowing and intelligent even though defendant was not aware of all possible subjects of questioning in advance of interrogation). Anaya's waiver was not unknowing or unintelligent on this ground.

Anaya also argues that he was suffering an anxiety attack and could not act rationally. Even if the court accepts Anaya's statement to Dr. Manlove that he began suffering from an anxiety attack at some point during the interview, there is no evidence that this anxiety attack affected Anaya's ability to understand his rights or the consequences of his decision to waive these rights and make a statement. Indeed, Anaya's calm and steady tone of voice, logical thought process, and clear statement that he was treated fairly in his recorded statement indicate that Anaya was able to act knowingly and intelligently throughout the interview and polygraph exam, despite any anxiety or panic he was experiencing. Thus, Anaya's assertion that he suffered from an anxiety attack mid-interview does not show that his waiver of his rights to remain silent and to consult an attorney was not knowing and intelligent. See United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998) (finding waiver to be knowing and intelligent where defendant had low IQ and PCP intoxication because he was intelligent enough to understand his rights, was cooperative, initialed each admonition on the waiver form, and gave accurate information). Similarly, Anaya's assertion that the government cannot show that he was not subject to a physical or mental impairment that vitiated his knowing and intelligent will because the agents did not investigate his physical or mental health is unavailing.

Finally, Anaya argues that his waiver of rights prior to submitting to the polygraph examination cannot satisfy the purposes for which the Miranda

warnings are required when considered in light of the post-polygraph interrogation. The Eighth Circuit has held that "after a (warned) polygraph exam, there is no per se requirement for <u>Miranda</u> warnings before (admissible) post exam questioning." <u>United States v. Black Bear</u>, 422 F.3d 658, 664 (8th Cir. 2005) (citing <u>Wyrick v. Fields</u>, 459 U.S. 42, 48-49 (1982); <u>McDowell v. Leapley</u>, 984 F.2d 232, 234 (8th Cir. 1993); <u>Vasser v. Solem</u>, 763 F.2d 975, 978 (8th Cir. 1985); <u>United States v. Eagle Elk</u>, 711 F.2d 80, 83 (8th Cir. 1983)). Indeed, it is well established that "[m]erely disconnecting the polygraph equipment" does not remove the knowledge of the rights explained to the defendant before the examination from the defendant's mind. <u>See Vasser</u>, 763 F.2d at 978. And the fact that, as here, a new interrogator is involved in the post-polygraph interview does not mean that the suspect is no longer making a knowing and intelligent relinquishment of his rights. <u>See Black Bear</u>, 422 F.3d at 664-65. Considering the March 12, 2009, interview and polygraph exam as a whole, the court finds nothing in the circumstances of the post-polygraph questioning by either Agent Dawson or Agent Blackburn that would vitiate the knowing and intelligent nature of Anaya's pre-polygraph waiver of his rights.

Overall, the court agrees with Magistrate Judge Duffy's recommendation that Anaya's waiver of his <u>Miranda</u> rights on March 12, 2009, was voluntary, knowing, and intelligent. Considering the totality of the circumstances and Anaya's objections to Magistrate Judge Duffy's recommendation, the court finds that the government has met its heavy burden of showing that Anaya

voluntarily, knowingly, and intelligently relinquished his <u>Miranda</u> rights.

Anaya's objections to this portion of Magistrate Judge Duffy's report and

recommendation are overruled.

Because Anaya was fully advised of his <u>Miranda</u> rights on March 12,

2009, he voluntarily, knowingly, and intelligently waived these rights, and his

statements on this date were voluntary within the meaning of the Due Process

Clause, the court adopts Magistrate Judge Duffy's recommendation that

Anaya's motion to suppress his March 12, 2009, statements be denied, as

supplemented herein.

Based on the foregoing, it is hereby

ORDERED that the court adopts the Report and Recommendation of

Magistrate Judge Veronica L. Duffy (Docket 45) as supplemented herein and,

therefore, defendant's first motion to suppress statements (Docket 21) is denied.

Dated May 27, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE